AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

# UNITED STATES DISTRICT COURT
## FOR THE
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

v.



FILED
CLERK, U.S. DISTRICT COURT

FEB 10 2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPUTY

MAHSA PARVIZ
Write your full name here.

Case No. 2:21-cr-00293-SB (DMGx)
(Write the number of your criminal case.)

**MOTION FOR SENTENCE REDUCTION UNDER 18 U.S.C. § 3582(c)(1)(A) (Compassionate Release)**

(*Pro Se* Inmate)

---

## NOTICE

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain a person's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number. A filing may include *only* the last four digits of a social security number, the year of a person's birth, a minor's initials, and the last four digits of a financial account number.

---

## I. DOCUMENTS AND REQUEST TO SEAL

Does this motion include a request that any documents attached to this motion be filed under seal? (Documents filed under seal are not available to the public.)

☒ Yes ☐ No

## ATTACHMENTS

If you answered "Yes," please list below the documents you request be filed under seal:

all attachments

---

PARVIZ, MAHSA 54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

Please list below any documents you are attaching to this motion. A proposed release plan is included as an attachment. You are encouraged, but not required, to complete the proposed release plan. Also, a cover page for the submission of medical records and additional medical information is included as an attachment to this motion, as well as a cover page for the submission of additional information (for example, information related to victim abuse under §1B1.13(b)(4)). Again, you are not required to provide medical records or this additional information. For each document you are attaching to this motion, state whether you request that it be filed under seal because it includes confidential information.

| Document | Attached? | Request to Seal? |
|---|---|---|
| Proposed Release Plan | ☒Yes ☐No | ☒Yes ☐No |
| Additional Medical Information | ☒Yes ☐No | ☒Yes ☐No |
| Additional Information (e.g., victim abuse-related information under §1B1.13(b)(4)) | ☒Yes ☐No | ☒Yes ☐No |

## II. REQUEST FOR APPOINTMENT OF COUNSEL

I request that an attorney be appointed to help me.

☒Yes ☐No

## III. SENTENCE INFORMATION

Date of Sentencing: _July 12, 2022_

Term of Imprisonment Imposed: _61 Months_

Approximate Time Served to Date: _43 months_

Projected Release Date: _January 3, 2026_

Length of Term of Supervised Release: _3 years_

Have you filed an appeal in your case?

☒Yes ☐No

Are you subject to an order of deportation or an ICE detainer?

☐Yes ☒No

PARVIZ, MAHSA 54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

☒ I am suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which I am at risk of serious deterioration in health or death. *See* §1B1.13(b)(1)(C).

☐ There is an ongoing outbreak of infectious disease or ongoing public health emergency affecting, or at imminent risk of affecting, my correctional facility that, due to personal health risk factors and custodial status, has caused me an increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency, and such risk cannot be adequately mitigated in a timely manner. *See* §1B1.13(b)(1)(D).

☐ I am 65 years old or older; I am experiencing a serious deterioration in physical or mental health because of the aging process; and I have served at least 10 years or 75 percent of my term of imprisonment, whichever is less. *See* §1B1.13(b)(2).

☒ The caregiver of minor child/children or my child/children who is/are 18 years of age or older and incapable of self-care because of a mental or physical disability or mental condition has died or become incapacitated, and I am the only available caregiver for my child/children or adult disabled child/children. *See* §1B1.13(b)(3)(A).

☒ My spouse/registered partner, parent, immediate family member (child, spouse, registered partner, parent, grandchild, grandparent, or sibling), or someone whose relationship is similar to that of an immediate family member has become incapacitated, and I am the only available caregiver for them. *See* §1B1.13(b)(3)(B), (C), and (D).

☒ While serving this sentence, I was a victim of:

- sexual abuse involving a "sexual act," as defined in 18 U.S.C. § 2246(2); or
- physical abuse resulting in "serious bodily injury"

that was committed by or at the direction of a correctional officer, an employee, or contractor of the BOP or any other individual having custody or control over me. *See* §1B1.13(b)(4).

☒ There is another circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described above, are similar in gravity to the reasons described above. *See* §1B1.13(b)(5).

☐ I received an unusually long sentence, I have served at least 10 years of the term of imprisonment, and a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) would produce a gross disparity between the sentence

PARVIZ, MAHSA 54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES[1]

Title 18 U.S.C. § 3582(c)(1)(A) allows you to file this motion (1) after you have fully exhausted all administrative rights to appeal a failure of the Federal Bureau of Prisons (BOP) to bring a motion on your behalf or (2) 30 days after the warden of your facility received your request that the warden make a motion on your behalf, whichever is earlier.

Please include copies of any written correspondence to and from the BOP related to your motion, including your written request to the warden and records of any denial from the BOP.

Have you personally submitted your request for compassionate release to the warden of the institution where you are incarcerated?

☒ Yes, I submitted a request for compassionate release to the warden on (date) 12/7/2024 .
☐ No, I did not submit a request for compassionate release to the warden.

If you answered "No," please explain why not.

_____

_____

Did the warden deny your request?

☒ Yes, the warden denied my request on (date) 12/11/2024 .
☐ No, I did not submit a request for compassionate release to the warden.

## V. GROUNDS FOR RELEASE

This section includes specific citations to sections of the U.S. Sentencing Guidelines, specifically the policy statement at §1B1.13 (Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)), often referred to as "compassionate release."

Please use the checkboxes below to state the grounds for your request for compassionate release. Please select all grounds that apply to you. You may attach additional sheets if necessary to further describe the reasons supporting your motion. You also may attach any relevant exhibits. Exhibits may include medical records if your request is based on a medical condition, or a statement from a family member or sponsor.

_____

[1] The requirements for filing this compassionate release motion with the court differ from the requirements for submitting a compassionate release request to the BOP. This form should be used only for a compassionate release motion made to the court. If you are submitting a compassionate release request to the BOP, please review and follow the BOP program statement.

PARVIZ, MAHSA 54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

**A. Are you at least 70 years old?**

☐ Yes ☒ No

If you answered "No," go to Section B below. You do not need to fill out Section A.

If you answered "Yes," you may be eligible for release under 18 U.S.C. § 3582(c)(1)(A)(ii) if you
meet two additional criteria. *See* §1B1.13(a)(1)(B). Please answer the following questions so the
court can determine if you are eligible for release under this section of the statute.

Have you served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C.
§ 3559(c) for the offense(s) for which you are currently imprisoned?

☐ Yes ☐ No   N/A

Has the Director of the BOP determined that you are not a danger to the safety of any other person
or the community, as provided under 18 U.S.C. § 3142(g)?

☐ Yes ☐ No   N/A

**B. Do you believe there are other extraordinary and compelling reasons for your release?**

☒ Yes ☐ No

If you answered "Yes," please check all boxes that apply so the court can determine whether you
are eligible for release under 18 U.S.C. § 3582(c)(1)(A)(i). Section 3582(c)(1)(A) authorizes a
court to reduce a defendant's term of imprisonment if "extraordinary and compelling reasons"
warrant a reduction and "such a reduction is consistent with applicable policy statements issued by
the Sentencing Commission."

☐    I am suffering from a terminal illness. *See* §1B1.13(b)(1)(A).

☒    I am suffering from:

  - a serious physical or medical condition;
  - a serious functional or cognitive impairment; or
  - deterioration in my physical or mental health because of the aging process

  that substantially diminishes my ability to provide self-care within the environment of a
  correctional facility, and I am not expected to recover from this condition. *See*
  §1B1.13(b)(1)(B).

PARVIZ, MAHSA 54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

being served and the sentence likely to be imposed on the date I filed this motion, after full consideration of my individualized circumstances. *See* §1B1.13(b)(6).

Please explain below the basis for your request. If there is additional information that you would like the court to consider but which is confidential, you may include that information on a separate page; attach the page to this motion; and, in Section I above, request that that attachment be sealed.

_____

_____

_____

_____

## VI. PREVIOUSLY FILED MOTIONS

Have you previously filed any motions for a reduction in sentence (compassionate release) under 18 U.S.C. § 3582(c)(1)(A) (in any court)? See DKt. No. 150, which is fully incorporated herein and renewed by reference as though set forth at length. Filed by attorney Thomas Michael Bundy, Esq.

☒ Yes ☐ No

If you answered "Yes," were any of your previous motions granted?

☐ Yes ☒ No  See DKt. No. 164

If you have previously filed any motions for a reduction in sentence (compassionate release) under 18 U.S.C. § 3582(c)(1)(A), what about your circumstances or the law has changed since your other motion(s) that you believe now makes you eligible? Please provide details below. See DKt. 96 through 100 (incorporated)

I still have not received my medically necessary breast/chest surgery (medically necessary since August 2021 due to injury at a BOP facility, MDC-LA, & have been sexually & physically abused by male BOP staff). I've served over 37 mo. towards Ct. I & Ct. II & pending reversal under Dubin & Oyserniow. I'm a certified class member in N.D. CA USDC Case No. 4:23-cv-01455-YGR (Women's Coalition, et. al. v. BOP, et. al.) & retaliation by BOP staff on account of status as Plaintiff/Certified Class Member in the foregoing case (placement in SHU for "involuntary protective custody" for ~3 months, excessive placement in transfer center for over 30 days, now two months, in violation of 3/15/24 Preliminary Injunction and 12/6/24 Consent Decree, which expressly entitles Parviz to compassionate release. Change of Circumstances (fraud committed by Blake Mast discovered February 27, 2024) & 7 yr. old daughter at risk w/o a caregiver

PARVIZ, MAHSA 54652509

AO 250 (Rev. 09/24) Pro Se Motion for Compassionate Release

## VII. MOVANT'S DECLARATION AND SIGNATURE

For the reasons stated in this motion, I move the court for a reduction in sentence (compassionate release) under 18 U.S.C. § 3582(c)(1)(A). I declare under penalty of perjury that the facts stated in this motion are true and correct.

February 1st 2025
_____
Date

_____
Signature

mahsa Parviz
_____
Printed Name

54652509
_____
Federal Bureau of Prisons Register No.

Federal Transfer Center
_____
Federal Bureau of Prisons Facility

P.O. Box _____, Oklahoma City, OK
_____
Institution's Address

PARVIZ, MAHSA  54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

ATTACHMENT 1

# UNITED STATES DISTRICT COURT

## FOR THE

_CENTRAL_ DISTRICT OF _CALIFORNIA_

UNITED STATES OF AMERICA

v.

_MAHSA PARVIZ_
Write your full name here.

Case No. 2:21-cr-00293-SB (DMGx)
(Write the number of your criminal case.)

## PROPOSED RELEASE PLAN
### In Support of Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)

---

**NOTICE**

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should _not_ contain a person's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number. A filing may include _only_ the last four digits of a social security number, the year of a person's birth, a minor's initials, and the last four digits of a financial account number.

---

If you provide information in this document that you believe should not be publicly available, you may request permission from the court to file the document under seal. If the request is granted, the document will be placed in the electronic court files but will not be available to the public.

Do you request that this document be filed under seal?

☑ Yes ☐ No

PARVIZ, MAHSA  54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 1

## PROPOSED RELEASE PLAN

To the extent the following information is available to you, please include the information requested below. This information will help the U.S. Probation and Pretrial Services Office prepare for your release if your motion is granted.

### A. Housing and Employment

Provide the full address where you intend to reside if you are released from prison.

9702 Holmes Ave., Los Angeles, CA 90002
(Cornerstone House, BOP-approved RRC)

Provide the name and phone number of the property owner or renter of the address where you will reside if you are released from prison.

BaDonna Jarvis

Provide the names (if under the age of 18, please use only their initials), ages, and relationship to you of any other residents living at the above-listed address.

N/A

Do you know where you will work if you are released? If so, please provide the name and address of the employer and describe your job duties. If you do not have a specific employer, please describe the type of work you plan to do upon release.

Bravo Team Law - Legal Intern &
Steps to Health, Inc. - Non profit executive since 2013

List any additional housing or employment resources available to you.

58 Amador Ave., Atherton, CA 94027; 950 Mason St #350, San Francisco, CA 94108, 900 W. Olympic, Los Angeles, CA &, 15025 Farmcote Dr, Frisco, TX

### B. Medical Needs

Will you require ongoing medical care if you are released from prison?

☑ Yes ☐ No

PARVIZ, MAHSA 54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 1

Will you have access to health insurance if released?

☑Yes ☐No

If yes, provide the name of your insurance company and the last four digits of the policy number.

*fully insured PPO, Kaiser Permanente*

If no, how do you plan to pay for your medical care?

If no, are you willing to apply for government medical services (Medicaid/Medicare)?

☐Yes ☐No   *N/A*

Do you have copies of your medical records documenting the condition(s) for which you are seeking release?

☑Yes ☐No

If yes, please include them with your motion.

If no, where are the records located?

*BOP in possession of records*

Are you prescribed medication in the facility where you are incarcerated?

☑Yes ☐No

If yes, list all prescribed medication, dosage, and frequency.

*BOP in possession of records*

Do you require durable medical equipment (e.g., wheelchair, walker, oxygen, prosthetic limbs, hospital bed)?

☑Yes ☐No

PARVIZ, MAHSA 54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 1

If yes, list equipment required.

*binder for chest compression*

Do you require assistance with self-care such as bathing, walking, toileting?

☒ Yes ☐ No *during post-operative status*

If yes, list the required assistance and how it will be provided.

*Family will assist in locating a nurse or personal friends/colleagues w/ nursing background will assist*

Do you require assisted living?

☐ Yes ☐ No *unknown (depends on post-operative status)*

If yes, provide the address of the anticipated home or facility and the source of funding to pay for it.

Are the people you are proposing to reside with aware of your medical needs?

☒ Yes ☐ No

Do you have other community support that can assist with your medical needs?

☒ Yes ☐ No

Provide their names, ages, and relationship to you. If the person is under the age of 18, please use only their initials.

*Sisters - Dr. Maryam Parviz - in 40s*

Will you have transportation to and from your medical appointments?

☒ Yes ☐ No

PARVIZ, MAHSA  54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 1

Describe the method of transportation.

_A vehicle or a driver for a vehicle (i.e. Uber)_

## SIGNATURE

I declare under penalty of perjury that the facts stated in this attachment are true and correct.

_February 1st, 2025_
Date

_Signature_

_MAHSA PARVIZ_
Printed Name

_54652509_
Federal Bureau of Prisons Register No.

_Federal Transfer Center_
Federal Bureau of Prisons Facility

_P.O. Box 898801, Oklahoma City, OK 73189-8801_
Institution's Address

PARVIZ, MAHSA  54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

ATTACHMENT 2

# UNITED STATES DISTRICT COURT
## FOR THE
_CENTRAL_ DISTRICT OF _CALIFORNIA_

UNITED STATES OF AMERICA

Case No. 2:21-cr-00293-SB(DMGx)
(Write the number of your criminal case.)

v.

_MAHSA PARYIZ_
Write your full name here.

## MEDICAL RECORDS AND ADDITIONAL MEDICAL INFORMATION
### In Support of Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)

---

**NOTICE**

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain a person's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number. A filing may include *only* the last four digits of a social security number, the year of a person's birth, a minor's initials, and the last four digits of a financial account number.

---

If you attach documents to this form that you believe should not be publicly available, you may request permission from the court to file those documents under seal. If the request is granted, the documents will be placed in the electronic court files but will not be available to the public.

Do you request that the attachments to this document be filed under seal?

☒ Yes   ☐ No

PARVIZ, MAHSA  54652509

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

---

ATTACHMENT 2

# MEDICAL RECORDS AND ADDITIONAL MEDICAL INFORMATION

To the extent that you have medical records or additional medical information that supports your motion for compassionate release, please attach those records or that information to this document.

## SIGNATURE

I declare under penalty of perjury that the facts stated in this attachment are true and correct.

February 1st, 2025
Date

_____
Signature

MAHSA PARVIZ
Printed Name

54652509
Federal Bureau of Prisons Register No.

Federal Transfer Center
Federal Bureau of Prisons Facility

P.O. Box 898801, Oklahoma City,
Institution's Address
OK 93189-8801

PARVIZ, MAHSA 54652509

NAME: Mahsa Parviz
REG# 54652509
FEDERAL TRANSFER CENTER
P.O. BOX 898801
OKLAHOMA CITY, OK 73189-8801

Roybal Federal Courthouse
ATTN: CLERK (please file in 2:21-cr-00293-SB ** NOTICE: Random assignment of
district judge required prior to consideration of enclosed motion.)
see 9th Cir.#.25-00525
255 East Temple St.
Los Angeles, CA 90012



AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

ATTACHMENT 3

# UNITED STATES DISTRICT COURT
## FOR THE

CENTRAL    DISTRICT OF    CALIFORNIA

UNITED STATES OF AMERICA

Case No. 2:21-cr-00293-SB (SMGx)
(Write the number of your criminal case.)

v.

MAHSA PARVIZ
Write your full name here.

## COVER SHEET FOR ADDITIONAL INFORMATION
### In Support of Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)

---

### NOTICE

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain a person's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number. A filing may include *only* the last four digits of a social security number, the year of a person's birth, a minor's initials, and the last four digits of a financial account number.

---

If you attach documents to this form that you believe should not be publicly available, you may request permission from the court to file those documents under seal. If the request is granted, the documents will be placed in the electronic court files but will not be available to the public.

Do you request that the attachments to this document be filed under seal?

 Yes ☐ No

PARVIZ, MAHSA 54652503

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 3

## ADDITIONAL INFORMATION

To the extent that you have additional information that supports your motion for compassionate release, please attach those records or that information to this document.

## SIGNATURE

I declare under penalty of perjury that the facts stated in this attachment are true and correct.

February 1st, 2025
_____
Date

MAHSA PARVIZ
_____
Printed Name

54652509
_____
Federal Bureau of Prisons Register No.

Federal Transfer Center
_____
Federal Bureau of Prisons Facility

P.O. Box 898801, Oklahoma City, OK
_____
Institution's Address
              73189-8801

_____
Signature

PARVIZ MAHSA 54652509

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

----------------------------------------------------------------------------------------------------

FROM: 54652509
TO: Aaron, Aaron
SUBJECT: BOP-RSD-NRB-FSA@BOP.GOV
DATE: 01/02/2025 08:07:02 PM

In re: Pre-release Placement for MAHSA PARVIZ #54652509

---

Dear BOP Re-entry Services Division,

I was directed to contact you regarding issues with the internal processing of my 12 month of RRC on 01/03/2025 to the Cornerstone House (BOP-approved RRC in sentencing district) at 9702 Holmes Ave., Los Angeles, CA 90002 (Program Director: BaDonna Jarvis, Esq.; E-mail: BaDonna.WATTSUPCDC@gmail.com; Office: 323-996-5005; Cell: 323-331-7920.) I am designated to FDC Miami but am presently at the Federal Transfer Center (OKC airport) and am able to coordinate my own flight and accommodations to facilitate the release.

Please advise as I have served excess time and need to be released tomorrow.

Thanks,

/s/ Mahsa Parviz
c/o DonMichael Barbour, Esq.
donmichael@bravoteamlaw.com
(832) 607-9879
-----Aaron, Aaron on 12/30/2024 12:36 PM wrote:

>

1/1 Your email correspondence has been forwarded to the appropriate staff for review.

---

From: mparvizaehw@emailinterface.org <mparvizaehw@emailinterface.org>
Sent: Monday, December 30, 2024 9:14 AM
To: BOP-CPD-DSC-PolicyCorrespondence-S (BOP) <BOP-CPD-DSC-PolicyCorrespondence-S@bop.gov>
Subject: [EXTERNAL] Mahsa Parviz

In re: 12/29/2024 Request for Kayfez Credits for Mahsa Parviz #54652509

---

Dear DSCC,

Pursuant to BOP program statement P5880.30 and 18 U.S.C. Sec. 3585, time spent in custody after my Federal date of offense (06/11/2019) which was not credited towards another sentence must be credited by the BOP. Accordingly, I am respectfully requesting credit for the total of 272 days of prior time-served listed herein, which entitles me to immediate release:

Time spent in custody at Collin County Detention Facility towards TX Attempted Kidnapping offense, Case No. 219850152019 (offense date on judgment: 08/09/2010 & sentenced only to 500 days):

January 11, 2018 to January 18, 2018 (8 days)
April 9, 2018 to November 1, 2018 (205 days)
February 27, 2019 to April 9, 2019 (42 days)
August 9, 2019 to January 5, 2021 (516 days)

Time spent in custody in Palo Alto, California (case dismissed in Santa Clara County)
May 14, 2021 (1 day)

My personal counsel, DonMichael Barbour, Esq., can be reached at DonMichael@BravoTeamLaw.com or (832) 607-9879. He has been coordinating my safe release with Sr. SA Michael McCloskey (Southern Dist. of FL, Miami Division). I have been accepted to a BOP-approved RRC, the Cornerstone House, at 9702 Holmes Ave., Los Angeles, CA 90002 (Director: Ms.

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

--------------------------------------------------------------------------------------------------------

BaDonna Jarvis, Esq.. email: BaDonna.WATTSUPCDC@gmail.com) and they have a bed available for me right now if I am able to be released immediately.

Please help facilitate my immediate release and happy holidays!

Sincerely,
/s/ Mahsa Parviz

My email is BOP-CPD-DSC-PolicyCorrespondence-S@bop.gov 12inp2

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

---------------------------------------------------------------------------------------------

FROM: Aaron, Aaron
TO: 54652509
SUBJECT: F5939497
DATE: 01/06/2025 10:06:11 AM

1/1 Unfortunately, you were misdirected, the eligibility and release to a halfway house does not fall under the purview of the
DSCC. You will need to address the issue with members of your assigned unit team.


From: mparvizaehw@emailinterface.org <mparvizaehw@emailinterface.org>
Sent: Friday, January 3, 2025 2:24 PM
To: BOP-CPD-DSC-PolicyCorrespondence-S (BOP) <BOP-CPD-DSC-PolicyCorrespondence-S@bop.gov>
Subject: [EXTERNAL] Mahsa Parviz

In re: 01/03/2025 RRC Placement for MAHSA PARVIZ #54652509


Dear DSCC,

I was directed to contact you regarding issues with the internal processing of my 12 months of RRC on 01/03/2025 to the
Cornerstone House (BOP-approved RRC in sentencing district) at 9702 Holmes Ave., Los Angeles, CA 90002 (Program
Director: BaDonna Jarvis, Esq.. E-mail: BaDonna.WATTSUPCDC@gmail.com. Office: 323-996-5005. Cell: 323-331-7920.) I
was designated at FDC Tallahassee when my paperwork was submitted Summer of 2024 to DSCC by my former case manager
Betsy Alejandro (under SIA investigation). I was in involuntary protective custody for three months and for the past month since
December 3, 2024, I have been at the Federal Transfer Center (OKC airport). I am able to coordinate my own flight and
accommodations to facilitate the release.

Please advise as I have served excess time and need to be released to my halfway house today.

Thanks,

/s/ Mahsa Parviz
c/o DonMichael Barbour, Esq.
DonMichael@BravoTeamLaw.com
(832) 607-9879



My email is BOP-CPD-DSC-PolicyCorrespondence-S@bop.gov 12kben

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

--------------------------------------------------------------------------------------------------------

FROM: 54652509
TO: Aaron, Aaron; B, D; Bucur, Kaym; Janssen, K; Parvis, Shamsi
SUBJECT: bop-ogc-efoia-s@bop.gov
DATE: 01/11/2025 08:41:02 AM

In re: Remedy ID #1223484-R1 (Return All Time Credits to Facilitate Release for Mahsa Parviz #54652509)

Dear BOP Office of General Counsel,

On July 1, 2024, while housed at FCI Tallahassee, I mailed two BP-10 forms regarding the same subject-matter (retaliatory transfer in violation of FRAP 23(a), constitutional due process & the 03/15/24 Preliminary Injunction in N.D. CA USDC No. 4:23-cv-4155-YGR wherein I am a plaintiff/certified class member, and exploitation by BOP staff) to the Western Regional Office in Stockton, California, as well as the Southeast Regional Office in Atlanta, Georgia (the latter was done at the direction of my case manager at the time, Ms. Betsy Alejandro.) I have not yet received a response to the BP-10 mailed to the Western Regional Office, but the Southeast Regional Office received my BP-10 on July 8, 2024 & provided a Rejection Notice dated December 27, 2024 but postmarked January 2, 2025 and received at the Federal Transfer Center of Oklahoma City, OK, wherein I am presently held, on January 7, 2025.

Neither of the two BP-10s mailed on July 1, 2024 were timely resolved or rejected. The 1st reject reason provided on Remedy ID #1223484-R1 states "You submitted your request or appeal to the wrong level. You should have filed at the Institution, Regional Office, or Central Office Level. The 2nd reject reason says "see remarks" and the "remarks" states "appeal needs to be sent to Western Regional Office."

Because a substantially identical BP-10 was mailed to the Western Regional Office on July 1, 2024, and has not been resolved in a timely manner, I am appealing the BP-10 regional appeal Remedy ID #1223484-R1 to the central office. I do not have access to a BP-11 form and am sending the substance of a BP-11 form today, 01/11/2025, to the best of my ability given the circumstances and lack of assigned Unit Team while at this Federal Transfer Center. I AM REQUESTING RETURN OF ALL TIME CREDITS TO FACILITATE MY RELEASE (INCLUDING 54 GCT & 365 FSA TIME CREDITS) UNDER THE 3/15/24 PRELIMINARY INJUNCTION & 12/6/24 CONSENT DECREE OF 2:23-CV-4155-YGR IN N.D. CA USDC WHEREIN I AM A PLAINTIFF/CERTIFIED CLASS MEMBER, DUE TO VIOLATIONS OF CONSTITUTIONAL DUE PROCESS, CONTINUOUS FRAP 23(a), AND STAFF EXPLOITATION AND RETALIATORY TRANSFERS (SEXUAL, PHYSICAL, AND EMOTIONAL/MENTAL ABUSE INCIDENTS REPORTED TO SIA/OIA AND FBI.)

The BP-10 reads: "I was transferred from FDC SeaTac April 2024 and arrived at FCI Tallahassee May 7, 2024 and just now received forwarded mail pertaining to administrative remedy appeals submitted timely before transferring. I am submitting my forms to Eastern (Southeastern) Regional as directed to do so by staff in Tallahassee. Please process with an exemption from the 20-day/any deadlines as I just recently received the DHO report for a December 2023 mail abuse shot. Please expunge & return 27 days GCT as I NEVER allowed inmate Wanda Kilpack to leave with my legal papers (SIS photos show she took my private police reports... she conned my mother out of $1800 while at SeaTac and I'm a victim of her fraud.) Evidence shows I'm NOT guilty.

I met with Case Manager Betsy Alejandro on 06/12/2024 and she recommended that I receive 12 mo. halfway house at the BOP-approved RRC "Cornerstone House" at 9702 Holmes Ave., Los Angeles, CA 90002 (Program Director: BaDonna Jarvis, Esq.; E-mail: BaDonna.WATTSUPCDC@gmail.com; Office: 323-996-5005; Cell: 323-331-7920) under the Second Chance Act and also recommended application of my earned FSA time-credits (I would be a low if my history of violence score was properly reduced to 0 instead of 7 and I have personally assisted Unit Team at FDC SeaTac and FCI Tallahassee with development of standardized templates for 18 USC Sec. 3582(c)(2) sentence reductions, compassionate release, made PC Sec. 1381 demands for dismissal of state charged, victim impact statements in N.D. CA USDC No. 4:23-cv-4155-YGR, administrative remedy requests, 28 USC Sec. 2241 habeas petitions for FSA & GCT credits, immigration concerns, etc., to facilitate the release process for other inmates and lighten unit team's case load/tasks.) I am entitled to immediate release. Also as a Plaintiff/certified class member in N.D. CA USDC No. 4:23-cv-4155-YGR, the BOP is required to return my lost GCT (total of 54 days) and apply the lost FSA time-credits due to the retaliatory transfer (see Preliminary Injunction of 05/15/2024.) My habeas petition for return of GCT, FSA time credits & other time credits was filed 09/08/2023 in W.D. WA USDC No. 2:23-cv-01407-JHC -DWC & was appealed to the Ninth Circuit (No. 24-1315 & other related cases) so FRAP 23(a) applies and prevents physical and/or administrative transfers without first applying to the Court for permission and the duty to apply is on the BOP. The BOP violated FRAP 23(a) in April 2024 by physically transferring me from FDC SeaTac to FTC Oklahoma City, and the BOP violated FRAP 23(a) a 2nd time on 05/07/2024 by physically transferring me from FTC Oklahoma City to FCI Tallahassee for the

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C
---------------------------------------------------------------------------------------------

illegitimate excuse of having tentatively accepted me into the FIT program when I have NO drug need (-9 points in Recidivism
PATTERN worksheet) and have a family emergency related to my actual innocence claim in the habeas action as my daughter
is missing and I recently discovered evidence of fraud on the Court by her biological father which led to my state & federal
charges. The cumulative impact of this retaliatory transfer has interfered with my ability to litigate all parallel proceedings
(including W.D. WA USDC No. 2:23-cv-01620-TL; 2:23-cv-00755-RSL; 9th Cir. Appeal Nos. 22-50160, 23-03506, 23-50008, 24-
2325; and N.D. CA USDC No. 2:23-cv-4155-YGR.) Please return all time credits to facilitate my release."



TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

-----------------------------------------------------------------------------------------

FROM: 54652509
TO: Aaron, Aaron; B, D; Bucur, Kaym; Cornerstone, Badonna; Janssen, K; Parvis, Shamsi
SUBJECT: kjanssen@rbgg.com
DATE: 01/20/2025 09:23:50 PM


In re: 4:23-cv-04155-YGR (California Coalition v. BOP) Notice of Intent
_____

Dear Ms. Kara Janssen, Esq. & case participants,

I just wanted to confirm what date the 12/6/24 Consent Decree in 4:23-cv-4155-YGR was signed by the Judge.

I believe I would have to file a Motion for Enforcement in that action to enforce the terms of the consent decree and am providing notice of my intent to do so.

I've already provided notice to relevant BOP staff/personnel that they are in violation of the terms thereunder as well as of the 03/15/24 preliminary injunction. I've requested specific performance & have experienced retaliation by a staffmember at the BOP Office of General Counsel on 01/17/25 (they issued me a bogus incident report aka "shot" for allegedly engaging in 299/297 "highly disruptive conduct most like mail abuse" to thwart my attempts in pursuing the administrative remedy process as you advised and prevent me from reporting the ongoing violations, including the eploitation, physical and sexual abuse committed by BOP staff.) A Liutenant lower on the chain of command, Lt. Jones at the Federal Transfer Center at Oklahoma City, OK, served me the 1/17/25 299/297 shot and threatened to put me in the SHU and take my email and phone priviliges if this conduct continues. The executive staff seems to condone their own misconduct and this is not the first time my attempts to notify the Court of what really goes on behind bars have been intercepted in some manner.

I spent nearly 3 months on involuntary protective custody at FCI Tallahassee SHU in relation to BOP staff abuse and have now been held at a transfer center for over 30 days (about 50 days now), none of my lost time credits due to the retaliatory transfers since closure of the Dublin facilities in April 2024 have been returned, and my release date without FSA credits or the 12 mo. of SCA halfway house to which I was promised is 01/03/2026. On 1/3/2025, I was supposed to start my 12 months of SCA halfway house at my BOP-approved RRC, the Cornerstone House at 1002 E. Holmes St., Los Angeles, CA 90002 (Program Direcor, Ms. BaDonna Jarvis, Esq. can be reached at BADONNA.WATTSUPCDC@GMAIL.COM). If my 365 days of time credits earned under the FSA were properly applied, I'd have also served excess time and am entitled to immediate release.

Please advise as I am afraid of being silenced yet again but need to be released. I look forward to hearing from you and thank you for all your help throughout this living nightmare.

Sincerely,

/s/ Mahsa Parviz
mparvizaehw@emailinterface.org
c/o DonMichael Barbour, Esq. (Personal Counsel)
DonMichael@BravoTeamLaw.com
(832) 607-9879

TRULINCS  54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

-----------------------------------------------------------------------------------------------------

FROM: 54652509
TO: Farahmand, Maryam
SUBJECT: MIM-EXECASSISTANT@BOP.GOV
DATE: 01/26/2025 02:06:27 PM


In re: AIC MAHSA PARVIZ (#54652509)
_____

Please process a direct transfer to the halfway house for AIC Parviz, who is a Plaintiff/Certified Class Member in the N.D. CA
USDC Case No. 4:23-cv-01455-YGR, and cannot be housed at a detention center, such as FDC Miami per Court orders therein
(see 03/15/2024 Preliminary Injunction and the Consent Decree at ECF 438 entered on 12/06/2024.)

AIC Parviz is designated to FDC Miami but has been held at the Federal Transfer Center at Oklahoma City, Oklahoma, for
approximately 2 months to date. Prior to this, she was at FCI Tallahassee SHU for approximately 3 months under involuntary
protective custody. On 01/03/2025, AIC Parviz was supposed to start her 12 months of Second Chance Act halfway house at
her BOP-approved RRC, the Cornerstone House, located at 9702 Holmes Ave., Los Angeles, CA 90002 (Program Director:
BaDonna Jarvis, Esq.; E-mail: BaDonna.WattsUpCDC@gmail.com), but was unable to do so as she remained housed at the
transfer center.

Due to the circumstances above, it would be best to prevent a physical transfer to FDC Miami and authorize her 12 months of
Second Chance Act halfway house so that she may be transferred from OKC to LAX airport immediately.

Respectfully,
_____/s/ Mahsa Parviz
c/o DonMichael Barbour, Esq.
Tel.: (832) 607-9879
E-mail: DonMichael@BravoTeamLaw.com

TRULINCS  54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

------------------------------------------------------------------------------------------------------------

FROM: Unit Management
TO: 54652509
SUBJECT: RE:***Inmate to Staff Message***
DATE: 01/30/2025 03:37:02 PM

This matter will looked in to and properly addressed.

Counselor Sheffield

From: ~^! PARVIZ, ~^!MAHSA <54652509@inmatemessage.com>
Sent: Sunday, January 19, 2025 9:30 PM
Subject: ***Request to Staff*** PARVIZ, MAHSA, Reg# 54652509, OKL-E-C

To: COUNSELOR SHEFFIELD (TEAM LIMA)
Inmate Work Assignment: ORDERLY

Please see this forwarded chain, which briefly details my complaint that the BOP has been violating (and continues to
violate) the terms of Court Orders in Cause No. 4:23-cv-4155-YGR. The requested remedy is specific performance thereunder
and, most importantly, I need my 365 days of FSA time credits applied and need my immediate release from FTC Oklahoma
City processed so that I am released by the next working weekday, TUESDAY, JANUARY 21, 2025.

Thank you,

/s/ Mahsa Parviz

(cc: clerk and all parties)
-----PARVIZ, MAHSA on 1/17/2025 7:34 PM wrote:

>

Dear Ms. Wendy Still,

I am a Plaintiff/Class Member in N.D. CA USDC Cause No. 4:23-cv-4155-YGR and I have been advised by class counsel, Ms.
Kara Janssen, to pursue the administrative remedy process due to the BOP housing me at a transfer center for over 30 days
(now ~45 days) and past my release date, all without facilitating my long overdue RRC transfer (my halfway house was
1/3/2025) and without applying my FSA credits at a rate of 15 days per month since I have been subject to a retaliatory
administrative status change and transfer upto the current date and ongoing from September 12, 2024 when placed in
involuntary protective custody at the FCI Tallahassee SHU due to sexual and physical abuse and exploitation by BOP staff.

I arrived to the Federal Transfer Center in Oklahoma City, OK, on December 3, 2024 and I am still housed here today on Friday,
January 17, 2025 in violation of the Preliminary Injunction of 3/15/24 and Consent Decree of 12/6/24 in the above-numbered
cause.

I am attempting to report this violation and ask for any assistance you can offer with notifying the Court and demanding specific
performance by the BOP to release me from BOP custody or at least immediately facilitate my transfer from the transfer center
to my halfway house at 9702 Holmes Ave., Los Angeles, CA 90002 (Cornerstone House, BOP-approved RRC, Program
Director: BaDonna Jarvis, Esq, email: badonna.wattsupcdc@gmail.com)

Thank you,

/s/ Mahsa Parviz
mparvizaehw@emailinterface.org
c/o Personal Counsel, DonMichael Barbour, Esq
DonMichael@BravoTeamLaw.com
(832) 607-9879
-----PARVIZ, MAHSA on 12/30/2024 9:22 PM wrote:

>

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

--------------------------------------------------------------------------------------------------------

Dear Ms. Wendy Still,

I'm a class member in the coalition v. dublin matter and have experienced retaliation and sexual abuse. My FSA credits and prior time credits are not being correctly applied, otherwise I am eligible for immediate release. Please see below and help. You can email me directly at mparvizaehw@emailinterface.org or via this e-CopOut.

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/30/2024 12:10 PM wrote:

>

Hi Dr. Makanya,

Is there any way I could speak to you a bit more regarding my situation? I'm doing whatever I can to be released ASAP but I would also appreciate any guidance or help you can offer with family reunification. My daughter's name is Clara Mahsa Parviz (DOB: 11/01/2017; Place of birth: McKinney, TX) & I'm the only parent on the birth certificate. My mother is Shamsi Damavandi (sdamavandi@collin.edu; (972) 375-1202) and she can give more information since she has access to documents that I don't while I'm in transit. I worry about my daughter all the time and I try to stay strong for her and my parents but it's hard doing everything on my own.

Thank you,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/30/2024 12:04 PM wrote:

>

In re: 12/29/2024 Request for Kayfez Credits for Mahsa Parviz #54652509

--------------------------------------------------------------------------------

Dear FTC Oklahoma Warden Zook,

I spoke to the Special Populations Coordinator, Dr. Makanya, this morning regarding my family emergency and the circumstances with my missing daughter and excessive time served (my FSA and prior time-credits have not been applied and my halfway house papers for 12 mo. under SCA were not submitted correctly despite my 01/03/2026 release date.) I was directed to contact you and DSCC regarding my release from your facility and any assistance you can offer.

Pursuant to BOP program statement P5880.30 and 18 U.S.C. 3585, time spent in custody after my Federal date of offense (06/11/2019) which was not credited towards another sentence must be credited by the BOP. Accordingly, I am respectfully requesting credit for the total of 272 days of prior time-served listed herein, which entitles me to immediate release:

Time spent in custody at Collin County Detention Facility towards TX Attempted Kidnapping offense, Case No. 219850152019 (offense date on judgment: 08/09/2010 & sentenced only to 500 days):

January 11, 2018 to January 18, 2018 (8 days)
April 9, 2018 to November 1, 2018 (205 days)
February 27, 2019 to April 9, 2019 (42 days)
August 9, 2019 to January 5, 2021 (516 days)

Time spent in custody in Palo Alto, California (case dismissed in Santa Clara County)

My personal counsel, DonMichael Barbour, Esq. can be reached at DonMichael@BravoTeamLaw.com or (832) 607-9879. He has been coordinating my safe release with Sr. SA Michael McCloskey (Southern Dist. of FL, Miami Division). I have been accepted to a BOP-approved RRC, the Cornerstone House, at 9702 Holmes Ave., Los Angeles, CA 90002 (Director: BaDonna Jarvis, Esq.; email: BaDonna.WATTSUPCDC@gmail.com) and they have a bed available for me right now if I am able to be released immediately. Alternatively, I can pay for my own flight out of OKC and housing, or my parents (BOP-approved visitors) can drive from 15025 Farmcote Dr., Frisco, TX 75035 to pick me up.

TRULINCS 54652509 - PARVIZ, MAHSA – Unit: OKL-E-C

---------------------------------------------------------------------------------------------------------------------

Please help facilitate my immediate release and happy holidays!

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/21/2024 11:27 AM wrote:

>

Please assist with this time-sensitive matter. I am currently eligible to go to the halfway house at 9702 Holmes Ave., Los
Angeles, CA 90002 (Program Director: BaDonna Jarvis, Esq.; email: BADONNA.WATTSUPCDC@GMAIL.COM).

Thank you,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/13/2024 10:13 AM wrote:

>

Dear Warden Zook,

It was a pleasure meeting you today. Per your request, I am providing the information of my BOP-approved halfway house, the
Cornerstone House, located at 9702 Holmes Ave., Los Angeles, CA 90002. The program director of the sober living house is
Ms. BaDonna Jarvis, Esq. and her email address is badonna.wattsupcdc@gmail.com. My outdate is 01/03/2026 with the
12 months of Second Chnace Act halfway house, I should be eligible to transfer there any day now.

I already have a bed available for me there and my previous case manager, Ms. Betsy Alejandro at FCI Tallahassee (currently
under SIA investigation), was supposed to submit the halfway house paperwork but it appears she instead submitted a transfer
and I am pending transfer to FDC Miami instead of my halfway house.

I appreciate your help with this issue and thank you for your attention.

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/13/2024 10:01 AM wrote:

>

Thank you. May I please get a copy of my most recent team paperwork?
-----Warden on 12/11/2024 11:47 AM wrote:

>
This matter will not be reviewed while you are in holdover status.

---

From: ~^! PARVIZ, ~^!MAHSA <54652509@inmatemessage.com>
Sent: Monday, December 9, 2024 5:20 PM
Subject: ***Request to Staff*** PARVIZ, MAHSA, Reg# 54652509, OKL-E-C

To: WARDEN ZOOK
Inmate Work Assignment: Laundry Orderly

Dear Warden,

I am forwarding my Petition for Application of Earned FSA Time Credits to you for consideration (see below).

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/7/2024 3:19 PM wrote:

>

TRULINCS  54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

---------------------------------------------------------------------------------------------------------------------

PETITION TO WARDEN FOR APPLICATION OF EARNED FSA TIME CREDIT

Dear Unit Team and Warden,

I am writing to Petition the Warden for Application of my Earned FSA Time Credits ("FTCs"). My recidivism score was high and
dropped to a medium. I am a medical research scientist with government-sponsored publications listed on PubMed
(https://nih.pubmed.gov; search "Mahsa Parviz") and have a non-profit organization, STEPS to Health, Inc., which aims to
assist families of low socio-economic status with maintaining a healthy lifestyle. I have created templates for Amendment 821
sentence reductions and have helped unit team in SeaTac and Tallahassee with PC 1381 demands to the state (facilitate
disposition of pending state charges for inmates in order to apply for halfway house faster).

My outdate is 1/3/2026 and I could be home any day if my FSA credits were applied. I would greatly appreciate application of
my credits as my history of violence was incorectly calculated (should be 0 and was based on police reports without court
dispositions - my recidivism should be low).

Thank you and God bless!
/s/ Mahsa Parviz

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

----------------------------------------------------------------------------------------------------

FROM: Warden
TO: 54652509
SUBJECT: RE:***Inmate to Staff Message***
DATE: 01/28/2025 12:37:02 PM

A review of your Contact List revealed that you did not utilize accurate information when entering the information for your contacts into your TRULINCS account.

As a result, your Contact List was deleted due to a violation of BOP policy. Specifically, PS 4500.12, Trust Fund Manual, Chapter 14, part 14.10, TRULINCS Services, part c, which states in pertinent part:  It is the inmate's responsibility to maintain his/her own list with accurate contact information, to include first name; last name; relationship; language; and postal address. Inmates are subject to disciplinary action for lying and/or providing false or fictitious information regarding a contact (e.g., when complete name is not used; when information is altered to hide the identity of the contact; and any/all other attempts to mislead reviewing and monitoring staff as to the true identity and contact information).

The current limitation will remain in effect.

_____

From: ~^! PARVIZ, ~^!MAHSA <54652509@inmatemessage.com>
Sent: Monday, January 27, 2025 8:02 PM
Subject: ***Request to Staff*** PARVIZ, MAHSA, Reg# 54652509, OKL-E-C

To: SIS WRIGHT & SIS DAVIS
Inmate Work Assignment: ORDERLY

Dear Warden, I am forwarding a list of minimal contacts to you (SIS only approved sister's email so far) - Will you please reinstate my original contact list?

SIS Wright got approval from an AW on 1/21/25 to suspend my contact list access & place me on a "Contact Deletion Program" but I haven't seen DHO for the 1/17/25 shot, there aren't grounds to suspend access & there are no program statements authorizing a "Contact Deletion Program" (my attorneys & 3rd parties help me report BOP staff abuse AT TALLAHASSEE & there was miscommuniation w/ Mr. Wright). I need to email my mom (sdamavandi9217@gmail.com); Jaeyhun Oh (FL attorney) email: j.oh@fuchsberg.com; badonna.wattsupcdc@gmail.com (attorney & halfway house director) address: 9702 holmes ave., los angeles, ca 90002; Rory Donaldia - rory@tribecacares.com (business/legal advocate) 𝓂𝓅𝒶___
-----PARVIZ, MAHSA on 1/23/2025 7:14 AM wrote:

>

I've been waiting for my mother and my attorney to be added but have still not heard anything and my contacts aren't updated yet.

SHAMSI
PARVIZ
(972) 375-1202
SDAMAVANDI9217@GMAIL.COM
15025 FARMCOTE DR., FRISCO, TX 75035
MOTHER

DONMICHAEL
BARBOUR
(832) 607-9879
DONMICHAEL@BRAVOTEAMLAW.COM
*I don't know his current address - it's on the state bar of tx website*
ATTORNEY

MARYAM
FARAHMAND
MARYAMPK@GMAIL.COM
(469) 831-1070

TRULINCS  54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

---------------------------------------------------------------------------------

15025 FARMCOTE DR., FRISCO, TX 75035
SISTER

KARYN HILDE
BUCUR
KHBUCUR@COX.NET
I DON'T KNOW HER ADDRESS - SOMEWHERE IN LAGUNA HILLS & CAN BE VERIFIED ON STATE BAR OF CA WEBSITE
(949) 472-1092
ATTORNEY

BADONNA
JARVIS
9702 HOLMES AVE., LOS ANGELES, CA 90002
BADONNA.WATTSUPCDC@GMAIL.COM
the # starts w/ area code (323)

PLEASE ADD MY CONTACTS TODAY SO I CAN COMMUNICATE WITH MY FAMILY AND MY ATTORNEYS. I SPOKE TO SIS
OFFICER AARON YESTERDAY ABOUT THESE ISSUES AND SHE ASSURED ME IT WILL BE DONE IMMEDIATELY BUT I
AM STILL WAITING.

/s/ Mahsa Parviz
-----Trust Fund on 1/22/2025 7:47 AM wrote:

>
You on are on the Contact Deletion Program. Therefore, you have to submit all contact information with TRUE and CORRECT
first and last name.
First Name
Last Name
Send email
Address
true relationship

_____
From: ~^! PARVIZ, −^!MAHSA <54652509@inmatemessage.com>
Sent: Tuesday, January 21, 2025 11:47 PM
Subject: ***Request to Staff*** PARVIZ, MAHSA, Reg# 54652509, OKL-E-C

To: Trust Fund
Inmate Work Assignment: Orderly

I need my contact list, phone access and email access reinstated IMMEDIATELY. I also want to know why it was removed in the
first place and the name of the individual who removed my access please. I have not seen DHO on any alleged infractions and
no one else would be able to suspend my access to these priviliges. Moreover, the restrictions were imposed without any
semblance of due process.

/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 1/21/2025 5:44 PM wrote:

>

In addition to the foregoing restrictions, I cannot place any phone calls. Please reinstate all access and provide a reason as to
why my access was suspended on or about January 20, 2025 in the first place.

Thank you,

/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 1/21/2025 5:28 PM wrote:

>

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

----------------------------------------------------------------------------------------------------

Why am I not able to access my messages at all as of today? I have not done anything to be punished and it seems like the BOP is just retaliating against me for voicing my concerns and reporting ongoing abuse. This is a violation of my due process rights and I believe I'm being retaliated against.

I have not seen DHO as to this matter and no one but DHO would have the authority to suspend my access. In addition to not having access to any of my messages, all of my contacts are removed and I cannot access my contacts. Why am I being treated differently? All other similarly situated adults in custody have access to email and their contact list. Please reinstate all access and provide a reason as to why my access is being restricted.

cc: Kara Janssen (Class Counsel), DonMichael Barbour (Personal Counsel), Clerk for filing in N.D. CA Cause No. 4:23-cv-04155-YGR

/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 1/19/2025 9:30 PM wrote:

>

Please see this forwarded e-Copout chain, which briefly details my complaint that the BOP has been violating (and continues to violate) the terms of Court Orders in Cause No. 4:23-cv-4155-YGR. The requested remedy is specific performance thereunder and, most importantly, I need my 365 days of FSA time credits applied and need my immediate release from FTC Oklahoma City processed so that I am released by the next working weekday, TUESDAY, JANUARY 21, 2025.

Thank you,

/s/ Mahsa Parviz

(cc: clerk and all parties)
-----PARVIZ, MAHSA on 1/17/2025 7:34 PM wrote:

>

Dear Ms. Wendy Still,

I am a Plaintiff/Class Member in N.D. CA USDC Cause No. 4:23-cv-4155-YGR and I have been advised by class counsel, Ms. Kara Janssen, to pursue the administrative remedy process due to the BOP housing me at a transfer center for over 30 days (now ~45 days) and past my release date, all without facilitating my long overdue RRC transfer (my halfway house was 1/3/2025) and without applying my FSA credits at a rate of 15 days per month since I have been subject to a retaliatory administrative status change and transfer upto the current date and ongoing from September 12, 2024 when placed in involuntary protective custody at the FCI Tallahassee SHU due to sexual and physical abuse and exploitation by BOP staff.

I arrived to the Federal Transfer Center in Oklahoma City, OK, on December 3, 2024 and I am still housed here today on Friday, January 17, 2025 in violation of the Preliminary Injunction of 3/15/24 and Consent Decree of 12/6/24 in the above-numbered cause.

I am attempting to report this violation and ask for any assistance you can offer with notifying the Court and demanding specific performance by the BOP to release me from BOP custody or at least immediately facilitate my transfer from the transfer center to my halfway house at 9702 Holmes Ave., Los Angeles, CA 90002 (Cornerstone House, BOP-approved RRC, Program Director: BaDonna Jarvis, Esq, email: badonna.wattsupcdc@gmail.com)

Thank you,

/s/ Mahsa Parviz
mparvizaehw@emailinterface.org
c/o Personal Counsel, DonMichael Barbour, Esq
DonMichael@BravoTeamLaw.com
(832) 607-9879
-----PARVIZ, MAHSA on 12/30/2024 9:22 PM wrote:

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

--------------------------------------------------------------------------------------------------------------

>

Dear Ms. Wendy Still,

I'm a class member in the coalition v. dublin matter and have experienced retaliation and sexual abuse, My FSA credits and prior time credits are not being correctly applied, otherwise I am eligible for immediate release. Please see below and help. You can email me directly at mparvizaehw@emailinterface.org or via this e-CopOut.

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/30/2024 12:10 PM wrote:

>

Hi Dr. Makanya,

Is there any way I could speak to you a bit more regarding my situation? I'm doing whatever I can to be released ASAP but I would also appreciate any guidance or help you can offer with family reunification. My daughter's name is Clara Mahsa Parviz (DOB: 11/01/2017; Place of birth: McKinney, TX) & I'm the only parent on the birth certificate. My mother is Shamsi Damavandi (sdamavandi@collin.edu; (972) 375-1202) and she can give more information since she has access to documents that I don't while I'm in transit. I worry about my daughter all the time and I try to stay strong for her and my parents but it's hard doing everything on my own.

Thank you,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/30/2024 12:04 PM wrote:

>

In re: 12/29/2024 Request for Kayfez Credits for Mahsa Parviz #54652509

Dear FTC Oklahoma Warden Zook,

I spoke to the Special Populations Coordinator, Dr. Makanya, this morning regarding my family emergency and the circumstances with my missing daughter and excessive time served (my FSA and prior time-credits have not been applied and my halfway house papers for 12 mo. under SCA were not submitted correctly despite my 01/03/2026 release date.) I was directed to contact you and DSCC regarding my release from your facility and any assistance you can offer.

Pursuant to BOP program statement P5880.30 and 18 U.S.C. 3585, time spent in custody after my Federal date of offense (06/11/2019) which was not credited towards another sentence must be credited by the BOP. Accordingly, I am respectfully requesting credit for the total of 272 days of prior time-served listed herein, which entitles me to immediate release:

Time spent in custody at Collin County Detention Facility towards TX Attempted Kidnapping offense, Case No. 219850152019 (offense date on judgment: 08/09/2010 & sentenced only to 500 days):

January 11, 2018 to January 18, 2018 (8 days)
April 9, 2018 to November 1, 2018 (205 days)
February 27, 2019 to April 9, 2019 (42 days)
August 9, 2019 to January 5, 2021 (516 days)

Time spent in custody in Palo Alto, California (case dismissed in Santa Clara County)

My personal counsel, DonMichael Barbour, Esq. can be reached at DonMichael@BravoTeamLaw.com or (832) 607-9879. He has been coordinating my safe release with Sr. SA Michael McCloskey (Southern Dist. of FL, Miami Division). I have been accepted to a BOP-approved RRC, the Cornerstone House, at 9702 Holmes Ave., Los Angeles, CA 90002 (Director: BaDonna Jarvis, Esq.; email: BaDonna.WATTSUPCDC@gmail.com) and they have a bed available for me right now if I am able to be released immediately. Alternatively, I can pay for my own flight out of OKC and housing, or my parents (BOP-approved visitors) can drive from 15025 Farmcote Dr., Frisco, TX 75035 to pick me up.

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

---------------------------------------------------------------------------------------------------

Please help facilitate my immediate release and happy holidays!

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/21/2024 11:27 AM wrote:

>

Please assist with this time-sensitive matter. I am currently eligible to go to the halfway house at 9702 Holmes Ave., Los
Angeles, CA 90002 (Program Director: BaDonna Jarvis, Esq.; email: BADONNA.WATTSUPCDC@GMAIL.COM).

Thank you,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/13/2024 10:13 AM wrote:

>

Dear Warden Zook,

It was a pleasure meeting you today. Per your request, I am providing the information of my BOP-approved halfway house, the
Cornerstone House, located at 9702 Holmes Ave., Los Angeles, CA 90002. The program director of the sober living house is
Ms. BaDonna Jarvis, Esq. and her email address is badonna.wattsupcdc@gmail.com. My outdate is 01/03/2026 and with the
12 months of Second Chnace Act halfway house, I should be eligible to transfer there any day now.

I already have a bed available for me there and my previous case manager, Ms. Betsy Alejandro at FCI Tallahassee (currently
under SIA investigation), was supposed to submit the halfway house paperwork but it appears she instead submitted a transfer
and I am pending transfer to FDC Miami instead of my halfway house.

I appreciate your help with this issue and thank you for your attention.

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/13/2024 10:01 AM wrote:

>

Thank you. May I please get a copy of my most recent team paperwork?
-----Warden on 12/11/2024 11:47 AM wrote:

>
This matter will not be reviewed while you are in holdover status.

_____
From: ~^! PARVIZ, ~^!MAHSA <54652509@inmatemessage.com>
Sent: Monday, December 9, 2024 5:20 PM
Subject: ***Request to Staff*** PARVIZ, MAHSA, Reg# 54652509, OKL-E-C

To: WARDEN ZOOK
Inmate Work Assignment: Laundry Orderly

Dear Warden,

I am forwarding my Petition for Application of Earned FSA Time Credits to you for consideration (see below).

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/7/2024 3:19 PM wrote:

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

-------------------------------------------------------------------------------------------

>

PETITION TO WARDEN FOR APPLICATION OF EARNED FSA TIME CREDIT

Dear Unit Team and Warden,

I am writing to Petition the Warden for Application of my Earned FSA Time Credits ("FTCs"). My recidivism score was high and dropped to a medium. I am a medical research scientist with government-sponsored publications listed on PubMed (https://nih.pubmed.gov; search "Mahsa Parviz") and have a non-profit organization, STEPS to Health, Inc., which aims to assist families of low socio-economic status with maintaining a healthy lifestyle. I have created templates for Amendment 821 sentence reductions and have helped unit team in SeaTac and Tallahassee with PC 1381 demands to the state (facilitate disposition of pending state charges for inmates in order to apply for halfway house faster).

My outdate is 1/3/2026 and I could be home any day if my FSA credits were applied. I would greatly appreciate application of my credits as my history of violence was incorectly calculated (should be 0 and was based on police reports without court dispositions - my recidivism should be low).

Thank you and God bless!
/s/ Mahsa Parviz

Attached: * Request for Compassionate Release (18 USC § 3582(c)(1)(A))
* Letters from Fred Pourbaba (FILO America)
* Letter from Chris Redlich, Jr. (Stanford)
* Compilation of forms, developed & validated from 2021 through current date in conjunction w/ Bravo Team Law internship, for pro se inmates (Sentence Reductions, Compassionate Release, PC 1381 demands for state charges)
* 2016 Certificate from the Fellows of American Association of Neurology
* 2016 Certificate of Post-Doctoral Fellowship in Applied Biostatistics (Harvard Clinical and Translational Sciences Center) - Dr. Brian Healy
* Publications from 2013-2017 (medical science research - available on PubMed.nih.gov)
* Articles of Incorporation - Massachusetts Steps to Health nonprofit

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

---------------------------------------------------------------------------------------------------------------

accepted to a BOP-approved RRC, the Cornerstone House, at 9702 Holmes Ave., Los Angeles, CA 90002 (Director: BaDonna Jarvis, Esq.; email: BaDonna.WATTSUPCDC@gmail.com) and they have a bed available for me right now if I am able to be released immediately. Alternatively, I can pay for my own flight out of OKC and housing, or my parents (BOP-approved visitors) can drive from 15025 Farmcote Dr., Frisco, TX 75035 to pick me up.

Please help facilitate my immediate release and happy holidays!

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/21/2024 11:27 AM wrote:

>

Please assist with this time-sensitive matter. I am currently eligible to go to the halfway house at 9702 Holmes Ave., Los Angeles, CA 90002 (Program Director: BaDonna Jarvis, Esq.; email: BADONNA.WATTSUPCDC@GMAIL.COM).

Thank you,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/13/2024 10:13 AM wrote:

>

Dear Warden Zook,

It was a pleasure meeting you today. Per your request, I am providing the information of my BOP-approved halfway house, the Cornerstone House, located at 9702 Holmes Ave., Los Angeles, CA 90002. The program director of the sober living house is Ms. BaDonna Jarvis, Esq. and her email address is badonna.wattsupcdc@gmail.com. My outdate is 01/03/2026 and with the 12 months of Second Chnace Act halfway house, I should be eligible to transfer there any day now.

I already have a bed available for me there and my previous case manager, Ms. Betsy Alejandro at FCI Tallahassee (currently under SIA investigation), was supposed to submit the halfway house paperwork but it appears she instead submitted a transfer and I am pending transfer to FDC Miami instead of my halfway house.

I appreciate your help with this issue and thank you for your attention.

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/13/2024 10:01 AM wrote:

>

Thank you. May I please get a copy of my most recent team paperwork?
-----Warden on 12/11/2024 11:47 AM wrote:

>
This matter will not be reviewed while you are in holdover status.


From: ~^! PARVIZ, ~^!MAHSA <54652509@inmatemessage.com>
Sent: Monday, December 9, 2024 5:20 PM
Subject: ***Request to Staff*** PARVIZ, MAHSA, Reg# 54652509, OKL-E-C

To: WARDEN ZOOK
Inmate Work Assignment: Laundry Orderly

Dear Warden,

I am forwarding my Petition for Application of Earned FSA Time Credits to you for consideration (see below).

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

---------------------------------------------------------------------------------------------

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/7/2024 3:19 PM wrote:

>

PETITION TO WARDEN FOR APPLICATION OF EARNED FSA TIME CREDIT

Dear Unit Team and Warden,

I am writing to Petition the Warden for Application of my Earned FSA Time Credits ("FTCs"). My recidivism score was high and
dropped to a medium. I am a medical research scientist with government-sponsored publications listed on PubMed
(https://nih.pubmed.gov; search "Mahsa Parviz") and have a non-profit organization, STEPS to Health, Inc., which aims to
assist families of low socio-economic status with maintaining a healthy lifestyle. I have created templates for Amendment 821
sentence reductions and have helped unit team in SeaTac and Tallahassee with PC 1381 demands to the state (facilitate
disposition of pending state charges for inmates in order to apply for halfway house faster).

My outdate is 1/3/2026 and I could be home any day if my FSA credits were applied. I would greatly appreciate application of
my credits as my history of violence was incorectly calculated (should be 0 and was based on police reports without court
dispositions - my recidivism should be low).

Thank you and God bless!
/s/ Mahsa Parviz

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

-----------------------------------------------------------------------------------------------

FROM: Dublin Monitor
TO: 54652509
SUBJECT: RE:***Inmate to Staff Message***
DATE: 01/22/2025 11:52:03 AM


Dear AIC Parviz,

Thank you for your correspondence.

I apologize for the delay of this response. The FCI Dublin's Monitor's team has now been established.  We are in the process of reviewing every email and/or letter we have received. Upon completion of our review of your email and the necessary follow-up you will receive a response.  If you have sent an email regarding your concern, there is not a need to send a second email if the condition has not changed.  I will be responding in the order the emails were received.

For future emails, please include the steps you have taken so far to resolve your issues.

In certain circumstances, it may be necessary to share pertinent contents of your email with Bureau of Prisons staff to rectify your concern.  By receipt of this email, you acknowledge this may occur. If you do not wish me to contact BOP, please advise me of this in a return email.

If you have documents that you would like to provide to me regarding your concern my mailing address is:

Wendy Still
Monitor for FCI Dublin
P.O. Box 270
Rocklin, CA 95677

Please mark your envelope on any mail correspondence sent to me as "Special Mail/Legal Mail Confidential".

Thank you very much for your patience.

Sincerely,

Wendy Still

Wendy Still
Monitor for FCI Dublin
Parviz,

Wendy Still
Monitor for FCI Dublin

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

-----------------------------------------------------------------------------------------------------------

FROM: 54652509
TO: Farahmand, Maryam
SUBJECT: kjanssen@rbgg.com
DATE: 02/03/2025 06:18:53 PM


***PLEASE FWD***                                                    2/3/2025

Dear Mrs. Janssen,
    I have been attempting to cooperate with the DOJ and OIG in the Southern District of Florida, at Miami, through my personal counsel (DonMichael@BravoTeamLaw.com; (832) 607-9879) regarding BOP staff sexual abuse and physical abuse. I was sexually and physically assaulted on 9/11/24 then placed on involuntary protective custody at FCI Tallahassee by Captain Ritchie and deliberately housed with violent inmates and known sex offenders for 3 months without any avenue to complain (NO law library access, mail would be screened and THROWN OUT if concerning BOP staff, and Officer Carlos Castillo would STILL force me to perform sexual acts while housed in the SHU for involuntary protective custody yet the Captain & Case Manager had full knowledge of his abuse involving me and another inmate, Frances Flores.) I've been again retaliated against while trying to seek help and my contacts were deleted entirely by BOP staff at the federal transfer center in Oklahoma City once they were contacted by the OIG about my concerns. BOP staff includes Officer Ramos from FCI Dublin; Officer Tai Barbee from FDC SeaTac; Officer A. Williams, Officer Carlos Castillo, Case Manager Betsy Alejandro, and Captain Tina Richie from FCI Tallahassee; and Officer J. Wright from FTC Oklahoma City. There should be video surveillance and I've send a litigation hold notice. Regarding Ramos, there were text messages & pics between me, Jacqueline Claire Hiner, him, and a few other female inmates.
    I'm tired of being silenced and abused behind bars. My FSA credits are being withheld from me & I'd be immediate release with my 54 GCT days & 365 days of FSA credits.
    CAN YOU PLEASE HELP GET ME RELEASED?
    My sister's email is maryampk@gmail.com & DonMichael Barbour can be reached about these issues, too. Lastly, I've been housed at the transfer center for 2 months in violation of the preliminary injunction of 3/15/24 and have been housed with about 7 biological males in violation of the 1/20/2025 Executive Order & have to shower next to men... staff does nothing but threaten to put me in SHU.

/s/ Mahsa Parviz
#54652509
FTC Oklahoma City

TRULINCS  54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

------------------------------------------------------------------------------------------------

FROM: 54652509
TO: Warden
SUBJECT: ***Request to Staff*** PARVIZ, MAHSA, Reg# 54652509, OKL-E-C
DATE: 02/03/2025 02:48:43 PM

To: WARDEN ZOOK
Inmate Work Assignment: ORDERLY

Dear Warden,

On 12/7/2024, I submitted my written Petition for Application of Earned FSA Time Credit along with a request for compassionate
release if I cannot have my FSA time credits applied (the electronic notice is provided in this chain of e-CopOuts.) I've been
sexually and physically assaulted by more than one BOP staff member and retaliated against for trying to report the staff abuse
thereafter. I am also a class member in N.D. of CA USDC No. 4:23-cv-01455-YGR. My halfway house date was supposed to be
on 1/3/25 for 12 months under the Second Chance Act (this doesn't even consider my FSA credits) and I've been at this transfer
center for exactly two months now but issues with retaliation resulted in my halfway house paperwork not being fully processed
by my case manager at FCI Tallahassee, Ms. Betsy Alejandro.

I've served about 43 months in BOP custody straight and served 17 months in custody at Collin County Detention Center in
McKinney, TX but never received credit by the BOP for this time. I've served in excess of what I should have and while at this
transfer center, was housed with biological males with whom I have had to unconscionably shower next to, all in violation of the
Executive Order issued on January 20, 2025.

Most importantly, I have a 7 year old daughter whom does not have an appropriate caretaker and whom was fraudulently and
voluntarily placed in CPS custody by her biological father. I cannot do anything to bring her home while in custody and am
desperate for help but have been severely violated and manipulated by certain BOP staff members along the way. I have
support in the community and ample financial resources, as well as a six-figure job offer at a law firm, Bravo Team Law, PLLC,
in Austin, TX. Releasing me is the first step to getting my life together and I believe that given the foregoing circumstances, in
addition to my direct appeal (9th Cir. C.A. No. 22-50160; Argued and Submitted May 17, 2024, Opinion pending publication)
which is pending a reversal on Ct. II (reduces total sentence to 37 months) qualifies me for either compassionate release or
release by applying my earned FSA time credits.

My family lives in the Dallas suburbs and can pick me up from here. I appreaciate any help you can offer and thank you for your
consideration.

Respectfully,
/s/ Mahsa Parviz
-----Warden on 1/6/2025 11:17 AM wrote:

>
You did not have a halfway house date on 01-03-2025. The Movement supervisor will look at your case and schedule you
accordingly.


From: ~^! PARVIZ, ~^!MAHSA <54652509@inmatemessage.com>
Sent: Friday, January 3, 2025 1:05 PM
Subject: ***Request to Staff*** PARVIZ, MAHSA, Reg# 54652509, OKL-E-C

To: WARDEN ZOOK
Inmate Work Assignment: ORDERLY

Dear Warden Zook,

I was supposed to be released to my halfway house today (see below). Please advise.

Thank you,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 1/2/2025 10:31 AM wrote:

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

--------------------------------------------------------------------------------------------

>

Dear Assistant Warden,

I have been trying to contact BOP staff regarding my 12 months of pre-release placement on 01/03/2025 to the Cornerstone House (BOP-approved RRC within my sentencing district) at 9702 Holmes Ave., Los Angeles, CA 90002 (Program Director: BaDonna Jarvis, Esq.; E-mail: BaDonna.WATTSUPCDC@gmail.com; Office: 323-996-5005; Cell: 323-331-7920). I have been at the Oklahoma City Federal Transfer Center for a month now and was informed there have been issues with my flight and internal paperwork. I can pay for airfare and any related accommodations in order to get to the Cornerstone House if this is the issue but I have served excess time and need to be released from the transfer center. Will you please help facilitate my release?

Thank you,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/21/2024 11:27 AM wrote:

>

Please assist with this time-sensitive matter. I am currently eligible to go to the halfway house at 9702 Holmes Ave., Los Angeles, CA 90002 (Program Director: BaDonna Jarvis, Esq.; email: BADONNA.WATTSUPCDC@GMAIL.COM).

Thank you,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/13/2024 10:13 AM wrote:

>

Dear Warden Zook,

It was a pleasure meeting you today. Per your request, I am providing the information of my BOP-approved halfway house, the Cornerstone House, located at 9702 Holmes Ave., Los Angeles, CA 90002. The program director of the sober living house is Ms. BaDonna Jarvis, Esq. and her email address is badonna.wattsupcdc@gmail.com. My outdate is 01/03/2026 and with the 12 months of Second Chnace Act halfway house, I should be eligible to transfer there any day now.

I already have a bed available for me there and my previous case manager, Ms. Betsy Alejandro at FCI Tallahassee (currently under SIA investigation), was supposed to submit the halfway house paperwork but it appears she instead submitted a transfer and I am pending transfer to FDC Miami instead of my halfway house.

I appreciate your help with this issue and thank you for your attention.

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/13/2024 10:01 AM wrote:

>

Thank you. May I please get a copy of my most recent team paperwork?
-----Warden on 12/11/2024 11:47 AM wrote:

>

This matter will not be reviewed while you are in holdover status.

_____
From: ~^! PARVIZ, ~^!MAHSA <54652509@inmatemessage.com>
Sent: Monday, December 9, 2024 5:20 PM
Subject: ***Request to Staff*** PARVIZ, MAHSA, Reg# 54652509, OKL-E-C

To: WARDEN ZOOK

TRULINCS 54652509 - PARVIZ, MAHSA - Unit: OKL-E-C

----------------------------------------------------------------------------------------------------

Inmate Work Assignment: Laundry Orderly

Dear Warden,

I am forwarding my Petition for Application of Earned FSA Time Credits to you for consideration (see below).

Sincerely,
/s/ Mahsa Parviz
-----PARVIZ, MAHSA on 12/7/2024 3:19 PM wrote:

>

PETITION TO WARDEN FOR APPLICATION OF EARNED FSA TIME CREDIT

Dear Unit Team and Warden,

I am writing to Petition the Warden for Application of my Earned FSA Time Credits ("FTCs"). My recidivism score was high and dropped to a medium. I am a medical research scientist with government-sponsored publications listed on PubMed (https://nih.pubmed.gov; search "Mahsa Parviz") and have a non-profit organization, STEPS to Health, Inc., which aims to assist families of low socio-economic status with maintaining a healthy lifestyle. I have created templates for Amendment 821 sentence reductions and have helped unit team in SeaTac and Tallahassee with PC 1381 demands to the state (facilitate disposition of pending state charges for inmates in order to apply for halfway house faster).

My outdate is 1/3/2026 and I could be home any day if my FSA credits were applied. I would greatly appreciate application of my credits as my history of violence was incorectly calculated (should be 0 and was based on police reports without court dispositions - my recidivism should be low).

Thank you and God bless!
/s/ Mahsa Parviz

# CERTIFICATE OF COMPLETION



Presented to

*Mahsa Parviz*

## PARENTING PHASE 1

January 29th, 2025
Federal Transfer Center, Oklahoma City, Oklahoma

O. Makanya, PhD
O. Makanya, Special Populations Coordinator

# CERTIFICATE OF COMPLETION



Presented to

*Mahsa Parviz*

## A HEALTHIER ME IN THE BOP

January 30th, 2025
Federal Transfer Center, Oklahoma City, Oklahoma

*O. Makanya, PhD*

O. Makanya, Special Populations Coordinator

# CERTIFICATE OF COMPLETION



Presented to

*Mahsa Parviz*

## WOMEN'S RELATIONSHIPS

January 30th, 2025

**Federal Transfer Center, Oklahoma City, Oklahoma**

*O. Makanya, PhD*

O. Makanya, Special Populations Coordinator

**CALIFORNIA COALITION FOR WOMEN PRISONERS, ET AL., Plaintiffs, v. UNITED STATES, ET AL., Defendants.**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2024 U.S. Dist. LEXIS 57206**

**Case No.: 4:23-cv-4155-YGR**

**March 15, 2024, Decided**

**March 15, 2024, Filed**

**Counsel**        {2024 U.S. Dist. LEXIS 1}For California Coalition for Women Prisoners, R. B., A. H. R., S. L., J. L., J. M., G. M., A. S., L. T., Plaintiffs: Adrienne Spiegel, Rosen Bien Galvan & Grunfeld LLP, Sixth Floor, San Francisco, CA; Amaris Montes, PRO HAC VICE, Rights Behind Bars, District of Columbia, Washington, DC; Carson Dean Anderson, Arnold and Porter Kaye Scholer LLP, Palo Alto, CA; D. Dangaran, Oren Nimni, PRO HAC VICE, Rights Behind Bars, Washington, DC; Ernest James Galvan, Ginger Jackson-Gleich, Rosen Bien Galvan & Grunfeld LLP, San Francisco, CA; Luma Khabbaz, Rosen Bien Galvan & Grunfeld LLP, CA, San Francisco, San Francisco, CA; Natalie Steiert, PRO HAC VICE, Arnold & Porter Kaye Scholer LLP, Washington D.C., DC; Stephen Seungkun Cha-Kim, Arnold & Porter Kaye Scholer LLP, New York, NY; Susan M. Beaty, California Collaborative for Immigrant Justice, Oakland, CA; Kara Jane Janssen, Rosen Bien Galvan & Grunfeld, Sixth Floor, United Sta, San Francisco, CA.

For United States of America Federal Bureau of Prisons, Colette Peters, Warden Thahesha Jusino, Defendants: Madison Lindsay Lovell Mattioli, LEAD ATTORNEY, U.S. Attorney's Office, Helena, MT; Abbie Joy Nordhagen Cziok, Helena, MT; Mark Smith, Edam, Colette,{2024 U.S. Dist. LEXIS 2} Billings, MT; Tim Tatarka, District of Montana, Billings, MT.

John Russell Bellhouse, Defendant, Pro se, Pueblo, CO.

Lawrence Gacad, Defendant, Pro se, Phoenix, AZ.

For Patrick Pool, Defendant: Geoffrey Becker, Becker & Becker, Lafayette, CA.

For FNU Shirley, Defendant: David Richard Griffith, LEAD ATTORNEY, Griffith Horn & Sheehan, LLP, Chico, CA.

For Warden Thahesha Jusino, Colette Peters, United States of America Federal Bureau of Prisons, Cross-defendants: Madison Lindsay Lovell Mattioli, LEAD ATTORNEY, U.S. Attorney's Office, Helena, MT; Abbie Joy Nordhagen Cziok, Helena, MT; Mark Smith, Edam, Colette, Billings, MT; Tim Tatarka, District of Montana, Billings, MT.

For FNU Shirley, Cross-defendant: David Richard Griffith, LEAD ATTORNEY, Griffith Horn & Sheehan, LLP, Chico, CA.

**Judges:** YVONNE GONZALEZ ROGERS, UNITED STATES DISTRICT JUDGE.

**Opinion**

**Opinion by:**        YVONNE GONZALEZ ROGERS

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Opinion

**Order Granting the Motion for Class Certification;**

**Granting in Part and Denying in Part the Motion for Preliminary Injunction;**

**Granting the Related Sealing Motions**

Re: Dkt. Nos. 10, 11, 45, 75, 99, 102, 111, 143, 159, 162, 168, 176, 178, 184, 191, 197, 199, 204, 206, 209

The Federal Correctional Institute ("FCI") Dublin is a dysfunctional mess.{**2024 U.S. Dist. LEXIS 3**} The situation can no longer be tolerated. The facility is in dire need of immediate change. Given the record presented and the Court's personal observations, further magnified by recent events, the Court finds the Bureau of Prison ("BOP") has proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years. The repeated installation of BOP leadership who fail to grasp and address the situation strains credulity. The Court is compelled to intercede.

For the reasons set forth below, the Court **Grants** plaintiffs' motion for class certification and **Grants in Part and Denies in Part** the motion for preliminary injunction. The Court issues these, and other anticipated Orders so that the constitutional rights of those imprisoned at the prison are no longer at significant risk. The Court shall appoint a special master forthwith. The Court will issue further Orders narrowly tailored to address the ongoing retaliation which has resulted from the convictions and sentencings of five prison officials, including the previous warden, for criminal sexual abuse and sexual contact. The special master shall assist the Court to{**2024 U.S. Dist. LEXIS 4**} ensure compliance with these orders. The Court has scheduled a conference on March 15, 2024, to further address the issue.

**BACKGROUND**

**A. Procedural Background**

Plaintiffs California Coalition for Women Prisoners, R.B., A.H.R., S.L., J.L., J.M., G.M., A.S., and L.T. bring this putative class action against defendants the United States of America; BOP; BOP Director Colette Peters; and the FCI Dublin Warden.1 Pending before the Court is plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23(b)(2), their Motion for a Preliminary Injunction on their Eighth Amendment and First Amendment claims, and various related sealing motions. (Dkt. Nos. 10, 11, 45, 75, 99, 102, 111, 143, 159, 162, 168, 176, 178, 184, 191, 197, 199, 204, 206, 209.)2

Plaintiffs filed their complaint on August 16, 2023, and amended in January 2024. (Dkt. No. 1 and 152, First Amended Complaint, "FAC".) In August of 2023, they concurrently filed their motion for a preliminary injunction and class certification. (Dkt. Nos. 10 and 11.) This case was related to the forty-eight-plus other civil rights cases currently pending against various FCI Dublin officers who have been criminally indicted or convicted. (*See* Case No. 4:22-cv-5137-YGR, Dkt. No. 152.) Because{**2024 U.S. Dist. LEXIS 5**} criminal proceedings against various officers are pending, the Court stayed all requests for individual damages until July 19, 2024.

The Court presided over an evidentiary hearing held from January 3-9, 2024, considered the parties' briefing filed before and after the evidentiary hearing, entertained oral argument on the December

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

11, 2023, and February 27, 2024, and conducted an in-person nine-hour inspection of the FCI Dublin
prison and its satellite camp.

Shortly before the evidentiary hearing in late December, plaintiffs filed a request for an emergency
order directing FCI Dublin to allow plaintiffs' counsel more time to prepare their witnesses for the
upcoming hearing. (Dkt. No. 79.) Plaintiffs' counsel was concerned that their clients had been
"conspicuously and inexplicably targeted by strip searches, cell searches and confiscation of legal
papers" and that FCI Dublin was planning on transferring some of their witnesses to other facilities.
(*Id.*) One potential witness who had earlier agreed to meet with plaintiffs' counsel and testify refused
to do so after notice of the strip search. (*Id.*)

The Court granted the motion in part and convened an emergency hearing on January 2, 2024.{2024
U.S. Dist. LEXIS 6} Given the severity of the retaliation allegations, the Court requested the United
States Attorney for the Northern District of California to attend the January 2, 2024, hearing and
ordered defendants not to transfer "any person on the witness lists filed in this action until further
order of th[e] Court." (*Id.*)

During the evidentiary hearing, the Court heard from nine FCI Dublin officials: warden Dulgov,
associate warden Deveney, executive assistant and satellite camp administrator Agostini
(collectively, "the New Leadership"), special investigative specialist ("SIS") lieutenant Putnam,
deputy captain E. Quezada, regional family support coordinator Newman, health services
administrator Wilson, chief psychologist Mulcahy, and correctional camp counselor Campos; chief of
the Office of Internal Affairs ("OIA") Reese; and fourteen inmates.

After the hearing, the Court paid an unannounced visit to FCI Dublin on February 14, 2024. It spent
nine hours touring first the prison, including medical services, dentist's office, various housing units,
the cafeteria during lunch, the UNICOR call center, the commissary, and the Special Housing Unit
("SHU"); then the satellite camp, with its two housing{2024 U.S. Dist. LEXIS 7} units and the
non-functioning kitchen. During its visit, the Court spoke confidentially to at least one hundred
inmates who readily approached throughout the day. In addition, the Court spoke to correctional
staff, medical staff, and counselors.

**B. Factual Background**

**1. The Facility**

FCI Dublin is an all-female facility composed of a low security federal prison and an adjacent
minimum-security satellite camp located in Alameda County, California.3 These are BOP's two
lowest security classifications.4 It was built in July of 1974. The adjacent satellite camp was built as a
federal detention center for adult males until 2014 when BOP repurposed it. FCI Dublin, unlike many
other BOP facilities, operates under a modified 6:00 a.m. to 2:00 p.m. schedule. The facility currently
houses roughly 550 incarcerated persons at the prison and over 100 at the satellite camp.5 The great
majority of persons who are incarcerated at FCI Dublin were convicted of drug offenses6 and more
than 90% are survivors of trauma.7

FCI Dublin consists of three housing units with two wings each. There are staff offices{2024 U.S.
Dist. LEXIS 8} downstairs in each of the wings for counselors, unit management, and custody staff.
Multiple computers are available in each unit in an open area. Each unit also contains separate
rooms with a monitor for video visitation and newly-installed pilot phones to allow incarcerated
persons to contact their attorneys and other inmate care confidentially. The prison contains medical
and dental services, food service, recreation areas, the commissary, the visitation areas, the
administration building, and other outbuildings for work details.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

The SHU contains sixteen cells in two wings. Each cell has its own toilet and shower. The SHU cells
can house two incarcerated persons at a time. The only visibility the cells have is a window slit facing
the internal hallway, along with a slot on the cell door for officers to pass those held in the SHU food
and hygiene items. Inmates are offered an hour of daily time for "recreation" in outdoor cages. The
SHU has a small room with one computer and a phone which the staff refer to as its "law library."

The satellite camp is adjacent to the prison and has two wings, a non-functioning kitchen, a law
library, and a common area in the middle of each wing for**{2024 U.S. Dist. LEXIS 9}** recreation.
Each wing has eight showers that are commonly used, and each cell contains its own toilet. Various
cells have been stripped of the tiles on the floor.

### 2. History of Sexual Abuse

FCI Dublin, like many other federal prisons that house female inmates, has a history of sexual
abuse.8 In 1999, after a criminal investigation, BOP entered into a settlement to address and reduce
the risk of horrific sexual abuse at the prison.

Twenty years later, a whistleblower's complaint sparked a Department of Justice ("DOJ") criminal
investigation that inculpated FCI Dublin officers ranging from the warden to the chaplain. The first,
Ross Klinger, charged in June of 2021, served as a former BOP correctional officer and recycling
technician.9 He pled guilty to, among other things, having sexual intercourse with various
incarcerated women. After his arrest, Klinger agreed to cooperate with DOJ's investigation into the
widespread sexual abuse at FCI Dublin, which was incredibly valuable as the majority of
incarcerated victims and witnesses were "extremely reluctant" to speak with federal prosecutors.10

Shortly after,**{2024 U.S. Dist. LEXIS 10}** DOJ filed criminal indictments against various officers,
including the previous warden Ray J. Garcia.11 As the warden, Garcia had the sole authority to
decide whether a complaint made under the Prison Rape Elimination Act ("PREA") should be
referred to criminal authorities. He was also responsible for ensuring that FCI Dublin complied with
PREA by training BOP regional staff, overseeing PREA officers at FCI Dublin, and administering
PREA auditing. Instead, he "created and perpetuated a culture of abuse at FCI Dublin." As the most
powerful person at FCI Dublin, Garcia held the power to liberate-by granting compassionate release
motions-and further punish-by placing incarcerated women in the SHU.12 He used both tactics to
coerce incarcerated women at the facility into sexually abusive relationships and ensure their
silence. Many of the women he abused testified that they were terrified he would place them in the
SHU, where they would be confined to "little cells, like dungeons," in retaliation. Before he was
arrested and during trial, Garcia insisted that the incarcerated women who testified against him were
lying for "personal gain."13

Given Garcia's "egregious conduct," it was "no surprise**{2024 U.S. Dist. LEXIS 11}** that the staff
Garcia supervised were *themselves* abusing inmates."14 In total, eight FCI Dublin officers were
indicted and six have been sentenced.15 Many of the incarcerated persons who DOJ interviewed
during its criminal investigation were initially reluctant to speak out, both because they distrusted
whether law enforcement would believe them and for fear of being placed in the SHU in
retaliation.16 Several who testified were, in fact, placed in the SHU after reports of sexual abuse.

DOJ's investigation into the sexual abuse at FCI Dublin is ongoing.

### 3. Current Conditions and BOP's Knowledge Thereof

During the evidentiary hearing, as noted, fourteen inmates testified about the conditions at FCI
Dublin. The Court received evidence that BOP established the "Dublin Support Team Task Force" to
investigate and provide support to FCI Dublin in light of DOJ's ongoing criminal investigation.17 In

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

March 2022, the Task Force internally published its findings and recommendations, which the Court
has since reviewed and considered{2024 U.S. Dist. LEXIS 12} as part of the evidentiary record.
Importantly, and as a preview, the report corroborates much, though not all, of the inmates'
testimony and the Court's own conclusions regarding the facility's existing environment. It also
demonstrates the extent and duration of BOP's own knowledge of those conditions.

Despite the criminal indictment of various FCI Dublin officers, which had occurred almost a year
earlier, allegations of ongoing sexual misconduct continued.18 Some of these allegations were not
only relayed by inmates but corroborated by FCI Dublin staff. OIA Chief Reese confirmed as much.

As part of the evidentiary record, plaintiffs submitted forty-seven declarations in August 2023. Of
those, the focus related mainly to claims of sexual misconduct stemming from the prior criminal
cases. The Court is skeptical of some of the claims made in the declarations and in-court testimony.
First, the Court is not at all convinced that any of the inmates ever used the term "sexualized
environment." That is a term drafted by lawyers and either fed to clients or regurgitated by lawyers in
court. Second, those who testified that the criminal cases and sentences had no impact on
deterrence{2024 U.S. Dist. LEXIS 13} were not believable. The unannounced visit's purpose was in
part to ask a much larger group of inmates more open-ended questions to discern whether sexual
misconduct at FCI Dublin was still pervasive.

The Court finds the allegation that a "sexualized environment" persists today at FCI Dublin
exaggerated. Most of the sexual misconduct testified about dated back to then-warden Garcia's
administration and was charged in the criminal cases. That said, the Court also does not believe the
government's assertion that it has eradicated the issue of sexual misconduct. The truth is somewhere
in the middle-allegations of sexual misconduct have lingered but to characterize it as pervasive goes
too far. However, and as the Court finds herein, because of its inability to promptly investigate the
allegations that remain, and the ongoing retaliation against incarcerated persons who report
misconduct, BOP has lost the ability to manage with integrity and trust. While BOP has, for example,
installed additional cameras throughout the facility, additional facility cameras can only do so much.
Many prison facilities have for that reason started using body cameras as well, both for the protection
of the{2024 U.S. Dist. LEXIS 14} inmates and the staff. FCI Dublin has not.

### 4. Staffing, Lack of Communication, Lack of Trust

The New Leadership consistently testified that FCI Dublin was effectively in dire straits upon their
arrival. First, the majority of the staff had insufficient training. Over fifty percent had been hired
during the COVID years and had not been provided normal training. Second, to say morale was low
was an understatement. Staff did not feel supported as was corroborated by the annual
administrative assessments conducted at FCI Dublin. Moreover, staff did not trust nor welcome the
new arrivals. Quezada testified to the hostility and anger from staff, including the loosening of the lug
nuts on her vehicle. Deveney described FCI Dublin as "the worst institution I've come across."

The source of the problems were apparent: the stigma associated with the ongoing criminal
investigation, the high cost of living in the Dublin area, the failure of the federal pay scale to be
competitive with similar local or state institutions, and the failure of the General Services Agency to
authorize on-site house trailers for staff.19 Because of the high cost of living, in addition, staff was
often forced to live far away,{2024 U.S. Dist. LEXIS 15} which makes commutes long, morale low,
and recruitment and retention difficult.20

None of these reflections were new. In March 2022, the Task Force reported the same. It concluded
that abusive conduct, lax oversight, and an atmosphere of intimidation had combined to create an
institutional culture of abuse that persisted "even when staff turnover occurred." Another "key

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

observation" was the "significant lack of communication" between FCI Dublin staff and its
incarcerated population. This again was quite evident during the evidentiary hearing when the Court
questioned the Dublin officers about the means and manner with which they were communicating
with the inmates. Whether on topics as significant as national policy or as routine as uniform
changes, FCI Dublin staff failed to communicate effectively.21

The testimony at the evidentiary hearing collectively revealed that because of the pervasive lack of
communication, and the fact that over 90% of the inmates suffer from mental distress, the ways in
which the New Leadership was communicating with inmates, even if reasonable, was viewed as
"retaliation" or punishment. During the hearing, inmates repeatedly reported that they are often**{2024
U.S. Dist. LEXIS 16}** threatened with the SHU for making any kind of report, whether for
malfeasance like sexual abuse or the enforcement of their rights, such as filing a medical complaint.
This was not new information; the Task Force had acknowledged that "[r]etaliation in the face of staff
threats is reprehensible and the Bureau has and must take ongoing steps to ensure inmate safety."22

The evidentiary hearing exposed the extensive distrust between staff and inmates though,
admittedly, pockets of trust do exist. Some staff are genuinely invested in the mission. Others are
reported to use profanity and derogatory language routinely, a basic failure to model respect. The
Task Force reported the same.23

Incarcerated persons consistently testified and advised during the visit that unit managers were
either inaccessible or "lacked a full understanding" of how to manage important administrative
functions, such as how the FIRST Step Act process works or how to process compassionate release
requests. None of these deficiencies are new.24 Because of them, inmates appeared to have no
access to routine processes, such as the forms to file administrative grievances.25

Incarcerated persons credibly testified that staff would**{2024 U.S. Dist. LEXIS 17}** single them out
after testifying. This is consistent with the New Leadership's own testimony that staff were hostile
even to them. Further, their failure to communicate and provide transparent explanations for
operational changes merely increased that distrust. Resorting to correctional "policies" that are not
evidence-based-such as a visual, or strip, search-*only after* incarcerated persons started engaging in
constitutionally-protected activities, such as meeting with their attorneys to file this suit, are logically
viewed as retaliatory by the incarcerated population. Then-acting warden Dulgov's in-court
explanation for these operational changes was delivered in a defiant and entitled manner. The Court
finds he was and effectively deaf to the inmates' BOP-inflicted trauma, concerns, and needs. The
Court left the evidentiary hearing with grave concerns about his leadership abilities, motives, and
judgment. Recent events magnify the concern.

**5. Medical and Mental Health Resources**

The testimony and site visit demonstrated the significant lack of health services and severe
understaffing. Here, again, for the reasons referenced above, inmates believe that this lack of
services is intentionally**{2024 U.S. Dist. LEXIS 18}** retaliatory. The Task Force recognized as
much26 and testimony and documents confirm that new leadership did not act to rectify the situation.
Although onsite staff claims to be up to date on medical appointments, it appears to have done so by
disregarding inmate concerns to clear the backlog. During its inspection, the Court heard a refrain so
consistent from so many inmates in different quarters and without prompting to demonstrate its
reliability: in response to their health concerns, medical staff told them to "lose weight and drink
water." Additionally, serious conditions, like possible breast cancer, are ignored because FCI Dublin
does not have the capacity onsite to treat them.27

**6. Dilapidated Conditions and Lack of Programming**

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

The dilapidated condition of the camp especially and the deplorable lack of programming merely compound the problem. The Court observed mold, the lack of hot water for showers in some of the units, and repeated refrains about the lack of warmth during the winter months. The Court has issued orders addressing some of these issues with which FCI Dublin has complied but, again, BOP knew about these problems years ago.28 With respect to programming, FCI Dublin does**{2024 U.S. Dist. LEXIS 19}** not comply with BOP policy. Evidence-based recidivism reduction programs, psychology programs, and vocational and occupational training, among others, are either limited or nonexistent. This lack of programming not only limits opportunities for enrichment and the wages incarcerated persons need to buy additional supplies at the commissary but also results in fewer opportunities to earn credits toward the FIRST Step Act and, therefore, longer sentences. BOP has done little to address the lack of programming since it was put on notice by the Task Force report. What limited programming was available, the Task Force noted, was distributed unevenly: inmates with longer sentences and Spanish-speaking inmates were unable to them.29

**7. Food Services and Religious Accommodations**

During its unannounced visit, the Court observed other concerning conditions. Although not within the scope of this Order, among the concerns raised during the Court's unannounced visit were the restrictions on prayer groups, lack of adequate kosher meals, and lack of fresh and nutritious food. Incarcerated persons report that food service's carb-heavy offerings, unsurprisingly, have made them gain significant weight with**{2024 U.S. Dist. LEXIS 20}** an attendant increase in weight-correlated concerns, like diabetes. The Dublin Task Force itself observed that food served in the cafeteria, at times, was not "remotely consistent" with national BOP policy and "grossly inadequate."30

**8. Inadequate Response: Moss Group Report**

After the Task Force published its report, FCI Dublin hired a private organization, the Moss Group, to address staff morale and institutional culture. This report was provided to the Court during the evidentiary hearing. The Moss Group, like the Dublin Task Force, concluded that the source of FCI Dublin's issues were: the lack of continuity among executive staff, the low staff morale of officers due to media attention and outside scrutiny, and the high cost of living in Dublin. Again, the Group observed a fear-based environment. It found that the lack of accountability helped perpetrate the "sexualized environment" that existed under Garcia and engendered distrust between staff and the incarcerated population. It recommended rebuilding an environment of professionalism with zero tolerance for abusive language or sexual misconduct, and leadership support for custodial staff.31

Because of the "toxic" culture, staff fear that incarcerated persons will report them for completing good operational practices, like cell searches, as retaliation. The newer ones fear that they will lose their jobs due to inmate complaints, so they reported shying away from enforcing rules. The spiral of distrust decreases safety and morale on both sides of the equation, and ultimately, results in the facility not being able to deliver on its core mission. The Moss Group concurred with some of those assessments.32

**9. Changes at FCI Dublin after the Dublin Task Force Report**

The New Leadership team33 testified that, after DOJ's criminal investigation and BOP's internal reckoning, BOP brought them in to "overhaul" FCI Dublin's executive team. Other managerial staff was also hired. Each received new training, such as trauma-informed care.

Importantly, the reporting mechanism for sexual conduct, as well as other criminal activity, changed. OIA is now in charge of investigating all serious but non-criminal employee misconduct.34 OIA is then required to submit any criminal misconduct, including sexual abuse, to the Office of the

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Inspector General ("OIG"). Prior to his departure, associate warden Deveney{**2024 U.S. Dist. LEXIS 22**} was named the PREA coordinator, in charge of monitoring PREA compliance and sexual assault allegations brought within the prison. In addition, as noted, in compliance with the Task Force's recommendations, FCI Dublin has installed many new cameras throughout its facility. FCI Dublin now has 385 cameras in operation, more than any other facility in its region.

Currently, there is one chief psychologist, Dr. Mulcahy, at FCI Dublin along with three staff psychologists and one drug treatment specialist.35 Dr. Mulcahy's department provides several services for inmates, including programming like the RESOLVE program for women have previously been sexually abused or the Trauma Life Workshop. In addition, FCI Dublin recently started working with Tri-Valley Haven, a rape crisis center that comes into the facility to provide 30 to 45-minute sessions for incarcerated persons.36 Wilson is the current health services administrator. In that position, he oversees both the provision of health care, including dental care, to the incarcerated population as well as its administration. Wilson testified that he oversees a staff of one vocational nurse, a registered nurse, a contractor nurse whose contract runs{**2024 U.S. Dist. LEXIS 23**} only for 120 days, an administrative assistant, a health information technologist, a full-time clinical pharmacist, and a part-time pharmacist.37 FCI Dublin, however, only has one part-time physician who works 32 hours a week.38

**10. Post-Hearing Developments**

At the end of its site visit, the Court told FCI Dublin staff that it had found out, through news reports, that FCI Dublin had transferred an incarcerated woman who testified at the evidentiary hearing, first to the SHU and then to another facility. It did so without prior authorization in violation of the Court's December 30, 2023, Order which unambiguously indicated: "Defendants are **Ordered Not to Transfer** any person on the witness lists filed in this action until further order of this Court." (Dkt. No. 88 (emphasis in original).) For that reason, the Court issued an Order to Show Cause why the government should not be held in contempt or sanctioned. (Dkt. No. 155.)

In addition, the Court issued an Order granting immediate, specific relief to plaintiffs based on emergency health and safety concerns observed at the satellite camp. (Dkt. No. 157.) Though the Court noted that it would not address all of plaintiffs' concerns until after{**2024 U.S. Dist. LEXIS 24**} the pending motions were fully briefed, it found that some required "immediate attention because they [fell] well below the standard of care required" of BOP. (*Id.*) First, it observed that, in one of the satellite camp units, only four of the eight showers were working and of those two had lukewarm water while the other two had only cold water. (*Id.*) The Court required FCI Dublin to ensure that all showers were in working condition and provided hot water by the end of February. (*Id.*) Second, it required FCI Dublin to have licensed contractors inspect the Satellite Camp for asbestos, black mold, and a possible gas leak. (*Id.*) It did so after observing black mold in the kitchen and housing units, hearing about possible asbestos problems from the inmates, and being told by every single inmate it talked to at the satellite camp that they had previously smelled natural gas throughout the facility. Third, it ordered FCI Dublin to pass out an extra set of blankets to the incarcerated persons at the satellite camp. (*Id.*) Finally, it ordered FCI Dublin to respond to various urgent medical requests it had observed, including the outbreak of a possibly infectious skin rash. (*Id.*)

After its Order{**2024 U.S. Dist. LEXIS 25**} to Show Cause, the government provided a response as to why it had transferred the incarcerated woman first to the SHU and then to another facility. Government counsel noted that it had misunderstood the Court's Order and, after a hearing, the Court discharged its contempt and sanctions Order.

In addition, FCI Dublin gave the women incarcerated at the satellite camp an extra blanket, insured that seven of the eight hot showers were fixed, and contracted for mold, asbestos, and natural gas

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

inspections. Each of these inspections was carried out. Because of the Court's Order, FCI Dublin also provided an additional health screening at the satellite camp.

On March 11, 2024, the FBI executed a search warrant at FCI Dublin. The New Leadership plus a captain were walked off the facility. The defendant then filed a notice to inform the Court that it had, again, replaced FCI Dublin's entire executive team. (Dkt. No. 211.)

## CLASS CERTIFICATION

Plaintiffs move to certify a class of "[a]ll people who are now, or will be in the future, incarcerated at FCI Dublin and subject to FCI Dublin's uniform policies, customs, and practices concerning sexual assault, including those policies, customs, and practices{2024 U.S. Dist. LEXIS 26} related to care in the aftermath of an assault and protection from retaliation for reporting an assault." (Dkt. No. 11, "Class Certification Mot." at 2.) They do so solely under Fed. R. Civ. P. 23(b)(2) and, at this juncture, for the purpose of adjudicating their motion for preliminary injunction on a classwide basis. Defendant opposes.

### A. Legal Framework

A party moving for class certification must first demonstrate that it can meet the four requirements of Rule 23(a): (1) **numerosity**: the class is so numerous that joinder of all members is impracticable; (2) **commonality**: there are questions of law or fact common to the class; (3) **typicality**: the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) **adequacy**: the representative parties will fairly and adequately protect the interests of the class. In addition, certification under Rule 23(b)(2) is proper only if "the party opposing the class has acted or refused to act on grounds generally applicable to the class."

### B. Rule 23(a)

### 1. Numerosity

A class must be sufficiently numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises{2024 U.S. Dist. LEXIS 27} forty or more members." *Krzesniak v. Cendant Corp.*, No. 05-cv-5156, 2007 U.S. Dist. LEXIS 47518, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007). Plaintiffs contend that this requirement is met because, as of August 2023, BOP reported that there were 674 people incarcerated at FCI Dublin. The government does not dispute this.

For that reason, the numerosity element is satisfied.

### 2. Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, the common questions must be of "such a nature that it is capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011). For purposes of Rule 23(a)(2), "even a single common question will do." *Id.* at 359 (cleaned up). In prison-conditions cases, commonality is satisfied where the lawsuit challenges "systemic policies and practices that allegedly expose inmates to a substantial risk of harm," even where there are "individual factual differences among class members." *Parsons v. Ryan*, 754 F.3d 657, 681-82 (9th Cir. 2014) (collecting cases) (internal quotation marks and citation omitted).

Plaintiffs argue that common issues include whether: (1) the BOP policies and practices place

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

plaintiffs at a substantial risk of harm because they permit sexual assault to occur, do not provide**{2024 U.S. Dist. LEXIS 28}** effective reporting mechanisms, fail to impose accountability, and facilitate retaliation; (2) whether defendants, who have known about staff sexual abuse and harmful conditions at FCI Dublin for years, have been deliberately indifferent to that risk; (3) whether defendants abdicated their oversight obligations to ensure adequate medical and mental health responses have been taken to mitigate the risk of harm to the class; and (4) whether, as part of their denial of effective reporting mechanisms, defendants' denial of access to counsel violates the constitutional rights of the class. Plaintiffs submit that BOP and FCI Dublin's policies and practices constitute common evidence capable of answering these questions "in one stroke." *Wal-Mart*, 564 U.S. at 350.

The Court agrees with that BOP and FCI Dublin's policies and practices will provide common proof of whether FCI Dublin has placed its incarcerated population at risk of sexual abuse, retaliation, and medical neglect. Anyone incarcerated at FCI Dublin is subject to the same BOP-wide policies on sexual assault prevention and reporting as well as their specific implementation by the officer overseeing reporting of PREA allegations at FCI Dublin. Plaintiffs proffer**{2024 U.S. Dist. LEXIS 29}** that FCI Dublin has a prison-wide custom of placing incarcerated persons accused of falsely reporting or actually committing sexual assault in the SHU, even if the investigation ultimately concludes they did neither. And there is evidence in the record that FCI Dublin's medical and mental health services are understaffed. Because this is sufficient for commonality purposes, the Court does not consider whether all the questions put forth by plaintiffs can be answered by common proof.

The government's arguments otherwise do not persuade. Its opposition largely rests on the argument that "individual fact and legal questions predominate over questions of policies related to sexual assault." This, as the government conceded at the February 27, 2024, hearing, is the wrong standard-whether individualized issues predominate is the standard for a damages class under Rule 23(b)(3), not an injunctive class under (b)(2). *See Parsons*, 754 F.3d at 688 (holding that Rule 23(b)(2) "does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test.") Standard aside, the government's focus on individualized issues misstates the relief sought. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 844, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (internal citation omitted) (holding that the question, for deliberate indifference**{2024 U.S. Dist. LEXIS 30}** under the Eighth Amendment, is whether prison officials "exposed a prisoner to a sufficiently substantial risk of serious damages to [their] future health," not whether a particular prisoner was particularly at risk). The motion does not contend that the individual, past harms suffered by named plaintiffs call for class treatment; instead, it argues that class certification is warranted because plaintiffs are all subject to a collective, future risk of injury under BOP policy and FCI Dublin custom. *See Parsons*, 754 F.3d at 676. As the Ninth Circuit explained in *Parsons*, when affirming the certification of a prison-conditions injunctive class, "[a]lthough a presently existing risk may ultimately result in different future harm for different inmates-ranging from no harm at all to death-every inmate suffers exactly the same constitutional injury when [they are] exposed to a single . . . policy or practice that creates a substantial risk of serious harm." *Id.* at 678. What named plaintiffs' declarations do-along with the hours of testimony presented at the evidentiary hearing, the hundreds of pages submitted as exhibits in support, and the Court's own inspection of FCI Dublin-is present evidence that such policies and practices exist.**{2024 U.S. Dist. LEXIS 31}** That volume of evidence is sufficient for the type of class sought here, the government's arguments otherwise notwithstanding.

The rest of the government's opposition on this point focuses on whether plaintiffs' claims are meritorious, rather than common. Again, this is the wrong question at class certification. Whether FCI Dublin places its incarcerated population at risk for retaliation, for example, is a question that will

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

be answered on the basis of its common customs even if the ultimate answer is that it does not.

For those reasons, the commonality element is satisfied.

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The typicality requirement looks to whether the claims of the class representatives [are] typical of those of the class, and [is] satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted) (alterations in original), *abrogated on other grounds by Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022). The requirement is "permissive," and the representative's claims need only be "reasonably{**2024 U.S. Dist. LEXIS 32**} co-extensive with those of absent class members." *Id.* (internal citation and quotation marks omitted).

The class certification motion argues that named plaintiffs are typical because they have all spent significant time at FCI Dublin; have experienced the same BOP and FCI Dublin policies and practices as the rest of the putative class; and have suffered the same alleged harms. The government argues, without elaboration, that the typicality requirement is not met because named plaintiffs have suffered different types of harm. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotation marks omitted). That each named plaintiff's alleged harm is factually distinct does not mean that their claims are of a distinct nature. Named plaintiffs bring the same type of claims-risk of sexual abuse and retaliation-for the same type of circumstances-incarceration at FCI Dublin, under the same policies and practices. For that reason, they meet the permissive typicality requirement.

The typicality requirement is satisfied.

### 4. Adequacy

For adequacy, Rule 23 requires that "the representative{**2024 U.S. Dist. LEXIS 33**} parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires inquiry into whether named plaintiffs and their counsel have any conflicts of interest with other class members, and whether plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). The government does not dispute that plaintiffs and their counsel will adequately represent the class.

Plaintiffs have already expended significant time meeting with their counsel to present the case, preparing declarations in support of the class certification and preliminary injunction motions, and attending an evidentiary hearing in which their testimony spanned several days. Class counsel has extensive experience litigating class actions on prison conditions in particular and have already shown themselves willing to vigorously represent their clients' interests.

The adequacy element is satisfied.

### C. Rule 23(b)(2)

Rule 23(b)(2) permits certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." To obtain certification under{**2024 U.S. Dist. LEXIS 34**} Rule 23(b)(2), plaintiffs must describe "the general contours of an injunction

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014)).

Plaintiffs seek the following injunctive relief: appointment of a special master that will oversee a comprehensive audit conducted by an outside agency of all FCI Dublin policies concerning staff sexual abuse, reporting, and retaliation; implementation of policies recommended by the outside auditor in consultation with organization plaintiff California Coalition for Women Prisoners; FCI Dublin's submission to quarterly site visits and provision of quarterly public reports regarding staff sexual abuse and retaliation, grievances against facility staff, and use of internal punitive measures; end of the use of solitary confinement or punitive segregation at FCI Dublin until it is determined that such confinement will not be used in a retaliatory manner; development of a substantive process for the return of non-contraband items seized from individuals'**{2024 U.S. Dist. LEXIS 35}** cells during searches; development and implementation of policies and procedures to provide high-quality offsite medical and mental healthcare for all members of the class; creation of a system to provide class members with documentation of reporting and participating in staff misconduct and to streamline and support requests from class members for related relief; and ensuring that all class members have consistent, timely, and confidential access to legal counsel. (Dkt. No. 10-48.)

Plaintiffs have sufficiently described the "general contours" of the injunction they seek, along with the common course of conduct for which it generally applies. Plaintiffs seek, for example, to stop the retaliatory use of the SHU and end the medical neglect of those incarcerated at FCI Dublin. For that reason, certification of this prison-conditions class is warranted. Indeed, the "primary role" of Rule 23(b)(2) "has always been the certification of civil rights class actions." *Parsons*, 754 F.3d at 686.

The Court therefore **Grants** plaintiffs' motion to certify a Rule 23(b)(2) class. It also **Grants** plaintiffs' motion to appoint the named plaintiffs and class counsel as its representatives.

**PRELIMINARY INJUNCTION**39

**A. Legal Framework**

A preliminary injunction is**{2024 U.S. Dist. LEXIS 36}** "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Alternatively, a preliminary injunction may issue where "serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor" if the plaintiff "also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. This is the Ninth Circuit's "sliding scale" approach, in which "the elements of a preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131. In all cases, at an "irreducible minimum," the party seeking an injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Pimental v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009)). "Where, as here, the government opposes a preliminary injunction, the third and fourth factors merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

In the context of prison**{2024 U.S. Dist. LEXIS 37}** litigation, the Court cannot give prospective relief without meeting the requirements of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

The PLRA requires that any preliminary injunction sought "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Id.* § 3626(2). In addition, the Court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief" and respect principles of comity. *Id.* "At the same time, however, federal courts 'must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners.'" *Porretti,* 11 F.4th at 1047 (quoting *Brown v. Plata,* 563 U.S. 493, 511, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011)). A preliminary injunction under the PLRA automatically expires after 90 days "unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." 18 U.S.C. § 3626(2).

## B. Likelihood of Success

Plaintiffs argue that they are likely to succeed on both their Eighth Amendment deliberate indifference and First Amendment retaliation claims.40 The government challenges both.41

### 1. Eighth Amendment

"The Constitution does{2024 U.S. Dist. LEXIS 38} not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (cleaned up). By prohibiting "cruel and unusual punishments," the Eighth Amendment both "places restraints on prison officials" and "imposes duties" on them. *Id.* at 832. Prison officials are restrained from sexually abusing incarcerated persons because "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir. 2000) (quoting *Farmer,* 511 U.S. at 834). They are also duty-bound to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer,* 511 U.S. at 832 (internal quotation marks and citations omitted). For that reason, Eighth Amendment claims fall into "three broad categories": failure to address the "serious medical needs of prisoners"; challenges to the conditions of confinement; and assertions that prison staff used excessive force against a prisoner. *Bearchild v. Cobban,* 947 F.3d 1130, 1140 (9th Cir. 2020) (internal citations omitted).

Whatever the category of claim, prison officials violate the Eighth Amendment "only when two requirements{2024 U.S. Dist. LEXIS 39} are met": the "deprivation alleged must be, objectively, sufficiently serious" and the prison official must have, subjectively, acted with "deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. at 834 (internal quotation marks and citation omitted). "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. A prisoner seeking prospective relief "for unsafe conditions," does not, however, need "to await a tragic event such as an actual assault before obtaining relief." *Id.* at 845 (cleaned up).

Plaintiffs allege two categories of Eighth Amendment claims here: **(a) excessive force**: plaintiffs allege that FCI Dublin has a "sexualized environment" that continues to place its incarcerated population at imminent risk of sexual abuse despite the criminal convictions of prison officials ranging from the previous warden to chaplain and BOP's subsequent replacement of all previous prison management; and **(b) inadequate medical and mental health services**: plaintiffs argue that its medical and mental health services are woefully understaffed, subjecting its incarcerated{2024 U.S. Dist. LEXIS 40} population-including survivors of sexual abuse committed by previous prison

**13**

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

officials-to medical neglect.42 The Court addresses both.

### a. Risk of Sexual Abuse

The parties do not dispute that the incarcerated persons at FCI Dublin were previously subjected to egregious, systematic sexual abuse by the very person charged with protecting them from such misconduct. Nor do they dispute that then-warden Garcia fostered a corrupt culture of misconduct and impunity so pervasive that DOJ has so far criminally indicted eight officers. What the parties do dispute, heatedly, is whether FCI Dublin is still demonstrating deliberate indifference to the incarcerated population's risk of sexual abuse.

*Objectively serious deprivation*. There can be no question that the sexual abuse that many incarcerated persons suffered at FCI Dublin was objectively horrific. Because the Court tried and sentenced many of these officers, it understands the backdrop well. One woman was raped in 2019 by then-chaplain Highhouse, a man many incarcerated at FCI Dublin sought out because "you can always trust a chaplain."43 Highhouse used the incarcerated woman's religion to coerce her into giving him oral sex and then proceeded{2024 U.S. Dist. LEXIS 41} to rape her for months.44 She was threatened with the SHU if she reported Highhouse and was told nobody would take the word of an incarcerated woman over the prison chaplain. Another incarcerated woman reported that then-officer Jones took her to the warehouse, locked her in, raped her, and then ejaculated on her face.45 Another officer witnessed the exchange and, instead of reporting the abuse and protecting her, started calling her "Becky," a slang term for oral sex.46 A Spanish-speaking incarcerated woman was allegedly raped by then-officer Smith and felt so trapped she attempted to commit suicide.47 The officer that found her, she alleges, pepper-sprayed her and hand-cuffed her still-bleeding wrists.48 She was later placed in the SHU after reporting the abuse.49 Some officers' disregard for the incarcerated population was so pervasive it became a joke: "it's not PREA if it's pre-approved."50 These accounts are a small, but representative, sample of the sexual abuse testimony the Court has heard. It is because of accounts like these that the Court found the previous warden, and certain members of his staff, so morally and ethically corrupt it imposed sentences substantially more onerous than{2024 U.S. Dist. LEXIS 42} the Sentencing Guidelines recommended.51

A more difficult question presented is whether people incarcerated at FCI Dublin are still at risk of sexual abuse. In support, plaintiffs present allegations of sexual abuse spanning from the Garcia to the Dulgov administrations. Because a preliminary injunction requires an imminent need for relief, the Court summarizes only the evidence postdating DOJ's criminal investigation and FCI Dublin's executive overhaul.

In March 2022, one incarcerated person testified that then-officer Gacad started harassing her.52 He "grabbed her butt," kissed her, and groped her every time she was on her work assignment.53 Later, in May 2022, officer Gacad entered her cell at night, kissed her, and touched her genitals.54 Another reported that then-officer Poole was sexually abusing an incarcerated woman, had choked her, and had threatened her into silence.55 In July 2022, a transgender male inmate testified that officer Vazquez kissed him on the lips and made suggestive comments.56 Several inmates complained that, in 2022, they were inappropriately groped by medical staff.57 More recently,{2024 U.S. Dist. LEXIS 43} plaintiffs submitted evidence that an officer who was still working at FCI Dublin as of March 2024 had been accused of undressing and molesting an inmate repeatedly from April 2022 to September 2022.58

In 2023, several inmates reported that officers looked in on them while they were showering.59 In January 2023, officer Caston allegedly told an incarcerated woman that she had "big-ass titties," groped her, and "rubbed his penis" on her backside.60 During the evidentiary hearing, an inmate testified that she witnessed officer Celestial grope another incarcerated women's breasts in March

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

2023.61 The witness eventually reported what she had seen to then-SIS lieutenant Putnam, who she testified told her she was not the first one that had reported officer Celestial for abuse.62 At the time of the hearing, she was still working under officer Celestial's supervision, despite requesting a transfer because of the sexual abuse she witnessed.63

Most recently, an incarcerated woman, K.C., testified that in November 2023 officer Narayan touched her lower back and told her that she was "lucky that there was cameras in the room," "insinuating" that without cameras "something might happen."64 After**{2024 U.S. Dist. LEXIS 44}** the incident, K.C. was berated by another officer for "being inappropriate with [the officer's] coworkers" and was fired from her job at food services, where she was paid $44 a month, and transferred to a job cleaning showers, where she was paid only $5 a month.65

During the evidentiary hearing, the Court noted that the bulk of incidents proffered dated from 2022 and therefore predated then-warden Dulgov's administration. The Court also noted that it had imposed severe punishments on the convicted FCI Dublin officers to deter such misconduct. Because of that, the Court expressed skepticism that the current conditions at FCI Dublin were "the worst by far," as one incarcerated woman testified.66 The Court was concerned that plaintiffs' counsel was leading, or coaching, the witnesses to use incendiary and conclusory phrases like "sexualized environment."67 The Court's unannounced visit was conducted, in part, to ask open ended questions intended to better discern the state of affairs at FCI Dublin.

During its nine-hour visit, the Court spoke to approximately 100 inmates it encountered throughout the prison, from the various housing units, to medical and food services, the SHU, the UNICOR**{2024 U.S. Dist. LEXIS 45}** facility, and the satellite camp. It asked almost every incarcerated person it encountered whether they thought sexual misconduct was still prevalent at FCI Dublin. The answer, largely, was no. Though the Court acknowledges the limitations of such a visit,68 the Court still finds it probative that, when asked spontaneously, many incarcerated persons responded that they did not fear sexual misconduct.

Given all the evidence before it, the Court ultimately concludes that plaintiffs have demonstrated that there is still a risk of sexual abuse. Ultimately, the Court finds that FCI Dublin is still in transition. Although much of the incarcerated population does not fear abuse, plaintiffs have presented incidents of sexual misconduct that occurred as recently as November 2023. Further, approximately twenty officers have been accused of misconduct, investigations are in progress, and they remain on administrative leave. Taken as a whole, the record undermines the government's argument that the Court should be confident that risk of sexual misconduct has been eradicated.

In so finding, the Court acknowledges that many of the officers currently stationed at FCI Dublin**{2024 U.S. Dist. LEXIS 46}** are professional and respectful. The Court also agrees that FCI Dublin's new pilot phone program and camera coverage are important steps in addressing the risk of sexual misconduct. Yet a culture of distrust and impunity, perpetrated from the top of the prison hierarchy, does not change overnight.

***Deliberate indifference***. Importantly, the Court finds that BOP's response to the crisis unfolding at FCI Dublin demonstrates that it has been, and is, deliberately indifferent to plaintiffs' risk of abuse. This is for at least three reasons. First, BOP has repeatedly failed to appoint a prison warden who is capable of understanding and responding to the gravity of the situation. Just this week, BOP has had to install the third executive team at the prison in a little over two years because DOJ has, again, walked-off the warden, associate warden, satellite camp administrator, and captain.69

Second, the evidentiary hearing revealed that PREA allegations are not solely investigated by OIG, as the government claims. Defendants themselves testified that an allegation of sexual misconduct

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

will often pass through several levels of scrutiny before it reaches OIG's desk. An incarcerated person who wishes{2024 U.S. Dist. LEXIS 47} to report sexual misconduct will often do so directly to FCI Dublin staff. As PREA administrator, then-assistant warden Deveney testified that he received many of these grievances. He stated, however, that he did not simply forward all complaints to OIA. Instead, he conducted his own "factfinding" of the allegation by, checking cameras for example, to determine if he thought the grievance was credible.70 These determinations were never documented. If the assistant warden determined the grievance was not credible or substantiated, then he simply closed it. Only when he independently determined that the allegation was credible did he forward it to OIA. OIA then screens the grievance for allegations of criminal misconduct.71 If a grievance does implicate criminal misconduct, OIA forwards it to OIG. Part of the problem, which Deveney conceded, is that FCI Dublin still does not have an institutional PREA plan in place to ensure "that allegations of sexual abuse are referred for investigation to [the] agency with the legal authority to conduct criminal investigations," as required by regulation. 28 C.F.R. § 115.22(b).

Likely due to the different levels of scrutiny, within which prison staff can still exert ample{2024 U.S. Dist. LEXIS 48} discretion, grievances of sexual misconduct can take months, if not years, to investigate and prosecute. Chief Reese, the head of OIA, noted in her testimony that OIA first received complaints of sexual abuse from FCI Dublin in 2019.72 Yet the government did not start prosecuting these cases, and requiring staff to leave FCI Dublin, until 2021.

Third, as the record shows, "zero tolerance" is not quite "zero." The Court is aware of at least two cases that demonstrate that not all officers accused of a PREA violation are now on administrative leave. In one, then-satellite camp administrator Agostini testified that, even though an incarcerated women reported that officer Cooper had walked in on her while she was showering, because the allegation did not constitute "physical touching," he was not placed on administrative leave.73 In the second, an incarcerated woman filed a serious allegation of sexual abuse in March 2023.74 Apparently because the incarcerated woman misspelled the name of the accused officer, BOP failed to conduct any further investigation. It was not until plaintiffs' counsel brought the grievance to the Court's attention and independently ascertained the officer's name that{2024 U.S. Dist. LEXIS 49} BOP placed him on administrative leave.75

FCI Dublin's incarcerated population will only be safe from further sexual predation when their allegations are properly reported and promptly investigated. BOP and FCI Dublin know this. BOP's failure to promptly respond to allegations in 2019 that then-Chaplain Highhouse was raping an incarcerated woman, for example, is why in 2021 he still had a position of power to abuse. Indeed, in its review of FCI Dublin's culture and practices, the Dublin Task Force warned that FCI Dublin's toxic culture was created, in part, because of a failure to follow policy. This culture could persist, the Task Force concluded, "even when staff turnover occurred."76

For those reasons, despite the progress that has been made, the Court has no option but to conclude that the government's response has been insufficient. The Court does not come to this decision lightly. Both sides have presented their case in all-or-nothing terms; both lack credibility and are counterproductive. Instead, in making this extraordinary decision, the Court grounds itself in BOP's repeated failure to ensure that the extraordinary history of this facility is never repeated.

### b. Inadequate Medical{2024 U.S. Dist. LEXIS 50} and Mental Health Services

Plaintiffs argue that FCI Dublin does not provide its incarcerated population, many of whom are survivors of sexual abuse, with constitutionally adequate medical or mental health care. The government disagrees.

The Eighth Amendment proscribes the government from demonstrating "deliberate indifference to

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

[the] serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L.
Ed. 2d 251 (1976). To state a claim for medical neglect, an incarcerated person must demonstrate,
first, a "serious medical need," and, second, that the prison acted or failed to act in such a harmful
way that it evidenced deliberate indifference. *Id.* at 106. When presented with a case of systemic
medical neglect, a court may consider "systemwide deficiencies in the provision of medical and
mental health care[], taken as a whole." *Brown v. Plata*, 563 U.S. 493, 505 n.3, 131 S. Ct. 1910, 179
L. Ed. 2d 969 (2011). Deliberate indifference can be caused by either prison officers delaying or
denying medical care or by prison medical staff providing inadequate care. *Estelle*, 429 U.S. at 104.
An "inadvertent failure to provide adequate medical care," however, is not sufficient. *Id.* at 105.

***Serious medical need***. Plaintiffs proffer evidence of serious medical and mental health care needs.
In this regard, context matters. As then-assistant warden Deveney testified, 90% of FCI
Dublin's**{2024 U.S. Dist. LEXIS 51}** incarcerated population have a history of trauma.77 Many are
survivors of sexual abuse that both predated and occurred during their incarceration at FCI Dublin.
These survivors suffer from anxiety, depression, panic attacks, post-traumatic stress disorder, and
paranoia.78 Their trauma, at times, manifests itself physically, with incarcerated women reporting
that they have lost their menstrual cycle and suffered from hair and significant weight loss, and
partial vision loss.79 Some have attempted to commit suicide.80

One incarcerated woman testified that, due to a botched surgery that occurred while she was
incarcerated, she must self-administer an enema, a painful and protracted process that requires her
to completely undress.81 Another reported suffering from fibromyalgia which causes her to
experience partial paralysis and, at times, leaves her in "excruciating pain."82 During her
incarceration, one of the declarants testified that she lost her hearing to the point that she could not
work.83 Another developed seizures while at FCI Dublin.84 Many women incarcerated at FCI Dublin
have a history of breast cancer, including breast cancer and leukemia.85

During its unannounced visit, the**{2024 U.S. Dist. LEXIS 52}** Court also witnessed the serious
medical and mental health needs of FCI Dublin's incarcerated population. Inmates complained of
dental care needs ranging from wisdom teeth that needed removing, dental abscesses, cavities, and
general lack of oral hygiene. The Court witnessed that many women suffered from skin issues,
especially at the satellite camp where many women had a similar skin rash and one woman had lost
all of her hair since she was incarcerated. Diabetes is common, as are other weight-correlated
issues. One incarcerated person described diabetic foot sores so severe they had turned necrotic.
Cancer, including breast cancer, and reproductive health is a recuring concern. One incarcerated
woman brought along medical files detailing endometriosis so widespread she was afraid she would
be left barren while another testified that she needed to be scheduled for a hysterectomy. Various
women complained about severe menstrual bleeding; one woman was pregnant. Many incarcerated
persons had suffered serious or chronic injuries, such as broken bones, a fractured eye socket, and
carpal tunnel.

The incarcerated women also shared their experiences with trauma. Many survivors talked
about**{2024 U.S. Dist. LEXIS 53}** enduring struggles with drug abuse, post-traumatic stress disorder,
seizures, anxiety, and suicidality. These symptoms, the Court witnessed, were magnified in the
isolated confines of the SHU.

***Deliberate indifference***. BOP understands that incarcerated persons "have a higher prevalence of
chronic medical and mental health conditions than the general population."86 Despite this, as staff
testified and the Court observed, FCI Dublin's medical and mental health care is woefully
understaffed. Then-assistant warden Deveney acknowledged that FCI Dublin only had fifty percent of
the necessary medical and mental healthcare staff.87 FCI Dublin, according to BOP policy, is

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

missing three mid-level health care providers, one paramedic, and two physicians.88 Perhaps most astonishingly, for a population that has recently ranged from 650 to over 700 incarcerated persons, FCI Dublin has only one, part-time, physician. Despite having the diagnostic equipment to conduct, for example, mammograms and x-rays onsite, it does not have the necessary specialists. For that reason, the examinations only occur in offsite facilities. At the time of the evidentiary hearing, FCI Dublin had neither an optometrist nor a dentist,{2024 U.S. Dist. LEXIS 54} though a dentist arrived the week of the Court's visit.

During the evidentiary hearing, the Court heard from health care administrator Wilson, who worked as a physician assistant for three months before he was promoted around December 2022 to oversee FCI Dublin's entire health care administration.89 His promotion occurred after DOJ's criminal investigation began and the Dublin Task Force visited.90

Wilson stated that his first goal was to organize the process of attending to patients because, at the time, that process was "overwhelming" due to "multiple staffing changes [which] resulted in a distrust of the healthcare system."91 The system for scheduling incarcerated patients was an "exponential kind of backlog of daily chaos," he testified.92 In short, FCI Dublin was, and is, "short-staffed."93 Only for truly urgent conditions, like a dental swelling or a urinary tract infection, is care provided in a timely fashion. Wilson testified that he did not proactively track whether he was seeing incarcerated patients as frequently as BOP policy requires and emphasized that in fact FCI Dublin was{2024 U.S. Dist. LEXIS 55} not in compliance.94

Dr. Mulcahy, FCI Dublin's chief psychologist, also testified that her department was "understaffed" and her services and treatment programs were seriously oversubscribed.95 For example, Dr. Mulcahy estimated that one trauma-informed program offered, Resolve, had a 100-person waitlist.96 Other programs that were previously offered, like the Residential Drug Abuse Program, were no longer offered.97 She was "not surprised to hear," Dr. Mulcahy testified, that FCI Dublin's survivors of sexual abuse did not feel like they had sufficient access to psychological care, though she believed this was in part due to distrust of the staff.

That said, Dr. Mulcahy's department has been a consistently bright spot during these proceedings. Though not universally beloved, which is to be expected, many of the incarcerated women who testified stated that they appreciated Dr. Mulcahy's therapy and expertise. The psychology department also does not seem to suffer from the same level of disfunction. According to Dr. Mulcahy, all new inmates at FCI Dublin are always seen within fourteen days of arrival. She had an internal program to ensure she kept track of all appointments and callbacks. While{2024 U.S. Dist. LEXIS 56} acknowledging that "we know SHU placement can also increase risk of suicidal behavior," Dr. Mulcahy testified that she regularly visits those incarcerated in the SHU.98 Dr. Mulcahy stated that she had recently implemented a diversion program to ensure that incarcerated persons who suffer from opioid or other drug addiction received treatment and support instead of simply ending up in the SHU.99 More recently, Dr. Mulcahy reestablished a connection to an outside rape crisis center, Tri-Valley Haven.100 Tri-Valley Haven provides counseling to the prison but slots are significantly limited.101 Despite this, Dr. Mulcahy testified, the introduction of a rape crisis center was a positive step toward transparency.

The lack of staffing was confirmed during the Court's unannounced visit. The first place the Court inspected was health services. Other than one lab technician, every door in health services was closed due to lack of staff. Those waiting in the dental clinic had waited months, if not longer, to receive dental care because FCI Dublin had only that very day acquired a dentist. The dentist, who was well-liked, had been asked to come out of retirement to help FCI Dublin provide care.

The impact{2024 U.S. Dist. LEXIS 57} of FCI Dublin's understaffed medical care system was stark.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Throughout its nine-hour visit, the Court heard differing opinions on everything from the staff to the geese feces that covers every inch of the sidewalk. The one, universal opinion was that FCI Dublin's medical services were horribly inadequate. Beyond the lack of staffing, at least one member of the staff was routinely, and consistently, reported to be disrespectful and dismissive. To many concerns, the Court was told that the standard refrain from healthcare staff to inmates was "drink water and exercise." Not surprisingly, the incarcerated population has a deep mistrust of the medical staff.

The depth of medical need that the Court witnessed, as stated above, was serious. The leadership has failed to act with any sense of urgency or creativity in resolving the issue. The situation is compounded for Spanish-speaking inmates who may not have the necessary interpretation services to make their illnesses understood. Another incarcerated person, situated at the satellite camp, told the Court that they are so sparsely supervised that an inmate broke her wrist, was not seen for days, and secured a splint only because another inmate{2024 U.S. Dist. LEXIS 58} built one out of cardboard and spare clothes.

At times, staff errors derail the limited care afforded. One incarcerated woman testified that she received an ultrasound on the wrong breast because there was no physician available at FCI Dublin to fix a mistake made on the referral.102 Another, who was concerned that without reproductive health treatment she would be left infertile, was repeatedly turned away. As noted elsewhere, one survivor of a previous officer's sexual abuse tried to commit suicide and was pepper-sprayed and hand-cuffed. It was not until the second time she tried to take her own life that she was given the medical and psychological attention she needed.

At the satellite camp, inmates identified, and the Court observed, conditions that may develop into significant health concerns. *See Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993) (holding that it could not agree that "prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.") The satellite camp's infrastructure is aging; incarcerated persons were concerned that some of the crumbling{2024 U.S. Dist. LEXIS 59} materials contained now-friable asbestos. While touring the camp kitchen and some of the cells, the Court could see visible spots of black mold.

Compounding the problem is that, even in the best of circumstances, FCI Dublin is not equipped to handle some of the chronic or urgent needs of its incarcerated population. A Care Level 2 facility like FCI Dublin is meant for incarcerated persons who are "stable" and require clinician evaluations every one to six months.103 These types of facilities are best equipped to manage conditions that require only routine monitoring. Care Level 3 inmates, on the other hand, are patients who have chronic medical or mental health conditions that require more frequent monitoring. Examples given by BOP guidance include patients with cancer in partial remission, severe mental illness on medication, or high-risk diabetic foot.104 Health administrator Wilson testified that, as a Care Level 2 facility, FCI Dublin does not have any Care Level 3 patients.105 Yet during the evidentiary hearing and its unannounced visit, the Court heard from several incarcerated women who seem to qualify for Care Level 3. Wilson implicitly acknowledged this; he testified that someone who{2024 U.S. Dist. LEXIS 60} attempted to commit suicide twice, as one incarcerated woman who testified did, should not be in a Level Care 2 facility.106

While acknowledging that at this early stage the record before it is necessarily incomplete, the Court finds that plaintiffs are likely to demonstrate that defendants were deliberately indifferent to their serious medical needs. The evidence demonstrates that FCI Dublin's lack of staffing, along with other systemic deficiencies, has left FCI Dublin incapable of providing constitutionally adequate medical and mental health care. Moreover, in determining whether prison conditions amount to

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

"unnecessary and wanton infliction of pain," courts can be informed by the "psychological trauma" carried by a particular incarcerated population. *See Jordan v. Gardner*, 986 F.2d 1521, 1525, 1528 (9th Cir. 1993) (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)). Given the facility's shocking history of sexual abuse, and the fact that multiple defendants testified that 90% of its population suffers from trauma, FCI Dublin's failure to provide adequate staffing amounts to unnecessary punishment.

Defendants' response does not persuade. The remedial measures taken are too little, and too late. It should not have taken a Court order to prompt action.107 Accordingly, the Court lacks{2024 U.S. Dist. LEXIS 61} confidence that defendants will act differently.108 BOP's own Dublin Task Force detailed many of the exact same concerns the Court witnessed in its unannounced visit two years ago. Yet the situation remains relatively the same. The Task Force raised the issues of (i) mold in the satellite camp; (ii) the lack of adequate staffing of the medical and mental health care; (iii) the monthslong wait times for even urgent problems, like breast cancer; and (iv) the serious distrust of staff. The Task Force advised that FCI Dublin's medical care was a "significant liability risk to the agency but more importantly, may result in lasting harm to the inmates."109 BOP has knowingly, and therefore deliberately, failed to address that risk.

## 2. First Amendment110

"Of fundamental import to prisoners are their First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts." *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005) (cleaned up). "Without those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices. And because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from{2024 U.S. Dist. LEXIS 62} any underlying misconduct they are designed to shield." *Id.*

Within the prison context, a First Amendment retaliation claim has five elements: "(1) An assertion that a state actor took some adverse action against an inmate; (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."111 *Rhodes*, 408 F.3d at 567-68. In determining whether the government's action reasonably advanced a legitimate correctional goal, courts must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 482, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)). "In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).

Plaintiffs argue that FCI Dublin continues to retaliate against those who report misconduct, including sexual abuse. That retaliation has taken many forms: transfer to the SHU; cell searches; loss of privileges like visitation, good time credits, or a coveted job; and, more recently, strip searches and bathroom inspections after a{2024 U.S. Dist. LEXIS 63} legal visit. Defendants respond that these are prison policies executed to maintain institutional order and safety that must be examined with due deference. In particular, the government emphasizes three institutional concerns: FCI Dublin is short staffed; it faces a serious drug problem; and given its zero tolerance policy, under which staff are walked off after an accusation of sexual misconduct, significant sanctions are required for false PREA allegations.

Retaliation was the foundation upon which then-warden Garcia built a "culture of abuse." DOJ indicted Garcia and the seven others, all of whom silenced their victims by threatening them with, or

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

actually sending them to, the SHU. Each reinforced the threat with private admonitions that no one would believe incarcerated women and publicly justified this retaliation by accusing their victims of making up PREA allegations for their own "personal gain." The message was potently deployed. Many incarcerated women testified they did not report the abuse because they were terrified of ending up in the SHU's "dungeon"-like cells and confident that no one would believe their reports.

Plaintiffs claim that they face an ongoing risk of retaliation-by-SHU**{2024 U.S. Dist. LEXIS 64}** for reporting misconduct at FCI Dublin. Placement in the SHU for reporting a PREA violation is an (1) adverse action (2) because of (3) plaintiffs' protected conduct that would (4) chill their First Amendment rights. The remaining issue is whether such a policy, nonetheless, reasonably advances a legitimate correctional goal.

The government contends it does. It claims FCI Dublin's use of the SHU is narrowly tailored: prison officials only place incarcerated persons in segregated housing for reporting *false* allegations of sexual misconduct. In that way, the use of the SHU advances two complementary correctional goals: (i) to stop false reporting by incarcerated persons and (ii) to keep staff members from being placed on administrative leave for a false report. The government submits that, in fact, one of plaintiffs' witnesses has made a demonstrably false PREA allegation.

The Court understands that FCI Dublin's incarcerated population could have reason to falsely report. A PREA allegation, at FCI Dublin especially, brings powerful consequences. For an incarcerated person, these consequences are perceived as positive. By accusing an officer of sexual misconduct, an incarcerated person might reason that**{2024 U.S. Dist. LEXIS 65}** they could avoid rules that are onerous, get rid of officers they do not like, and perhaps most compellingly, be released from prison early, bolster a civil claim for damages, or avoid deportation. Various incarcerated persons, in fact, told the Court that they believed others had falsely reported.

During its inspection, the Court also heard from inmates and staff alike that prison officials are now scared that they will receive a PREA allegation in exchange for imposing institutional order. In other words, prison staff also fear retaliation. To say staff morale at the prison is low would be an understatement. After their then-warden was criminally indicted, many staff members reported feeling "hurt, angry, confused, and completely failed by their previous administration," its own form of "trauma," according to chief psychologist Dr. Mulcahy.112 Some quit, feeling pressured by the constant media attention and outside scrutiny. The ones who have stayed, and the new ones who have joined, reported feeling that the risk of false reports is high, to the point of impacting their job to impose prison rules uniformly. Further, given its now infamous reputation, FCI Dublin has a hard time recruiting**{2024 U.S. Dist. LEXIS 66}** and maintaining staff. Many officers have had to start working significant over-time to make up the deficit. Several officers reported feeling frustrated that their colleagues were put on administrative leave pending investigation into their alleged misconduct with no foreseeable end date.

Though the Court understands the human nature on either end of a false PREA allegation, much of this is speculative because the record at this early stage only reflects one example of an alleged false PREA report. K.D., an incarcerated woman who testified during the evidentiary hearing, accused an officer of conducting an "aggressive and demeaning" pat down search during which she felt the officer inappropriately touched her breasts and nipples.113 K.D. reported the officer, though she never specifically claimed it was PREA violation.114 Because she included a report of inappropriate touching, however, officer Baudizzon reasonably understood her to be making an allegation of sexual harassment. Instead of discussing the incident with her, however, he accused her of making a false PREA report after watching a video of the incident. To punish K.D. for making what officer Baudizzon interpreted to be a false**{2024 U.S. Dist. LEXIS 67}** PREA allegation, K.D.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

was fired from her lucrative job; her visitation rights were taken away so she could not speak to her
family for months; she was prohibited from using the commissary; and she lost good time credits,
which pushed her release date back ten months and almost landed her in the SHU.

It is beyond dispute that the government's goals-to protect staff and deter fraud-are legitimate; what
the First Amendment demands, however, is that the government's means *reasonably* advance those
ends. As K.D.'s experience makes self-evident, FCI Dublin's use of the SHU, among other punitive
methods, to deter false reports will have the perhaps unintended but surely foreseeable consequence
of deterring incarcerated persons from making *true* reports. During the evidentiary hearing, various
incarcerated women reported that had previously been placed in the SHU for reporting abuse. One
incarcerated woman, for example, testified that she was placed in the SHU as "under investigation"
after she reported that officer Gacad sexually abused her in 2022.115 Soon after the evidentiary
hearing, R.F., who testified, was placed in the SHU for allegedly aiding someone else make a false
PREA report.116 R.F., believing she{2024 U.S. Dist. LEXIS 68} had been retaliated against, went
on a hunger strike. FCI Dublin transferred her to another facility without notifying the Court in express
violation of the Court's no-transfer Order. After the Court ordered defendants to show cause, BOP
transferred her back to FCI Dublin and the government conceded it neither had cause nor the proper
documentation for placing R.F. in the SHU. R.F. claims, credibly on this count, that the then-warden
and assistant warden actually targeted her for her involvement in this suit.117

Given the legitimate concerns raised by both parties, the Court must weigh the importance of the
interests affected. The prison fears retaliation that will worsen staff morale; the prisoners fear
retaliation that will keep them from reporting sexual abuse. Ultimately, the Court concludes, FCI
Dublin's long history of using the SHU to inappropriately quell inmates' First Amendment rights can
no longer be countenanced. *See Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (threats of
transfer because of inmates' complaints are retaliatory); *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir.
1997) (additional confinement that chilled protected speech considered retaliatory); *Wolff v.
McDonnell*, 418 U.S. 539, 557, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) (loss of good time credits
implicated a liberty, due process interest that cannot be "arbitrarily abrogated"); *Watison v. Carter*,
668 F.3d 1108, 1115 (9th Cir. 2012) (placing an{2024 U.S. Dist. LEXIS 69} inmate in administrative
segregation constitutes an adverse action); *Shepard v. Quillen*, 840 F.3d 686, 690 (placing someone
in administrative segregation for reporting staff misconduct is an adverse action); *cf. Jordan v.
Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993) (placing a "higher value" on a prisoner's life "than on
the staff's morale will constitute 'deliberate indifference'"). The Court understands that, since Garcia's
administration, much has changed. As the government notes, FCI Dublin has made an informed
effort to move away from the culture of abuse Garcia left behind. What FCI Dublin cannot seem to
leave behind, however, is its suspicion that it is the system, not incarcerated women, that is being
abused.

The evidence does not support the argument of widespread false reporting, at least not yet. Even so,
the Court is not convinced that the SHU would be a reasonable method of addressing it. The SHU is
draconian. As the evidentiary hearing demonstrated, and the Court has witnessed, incarcerated
women are terrified of it. Defendants understand this. Dr. Mulcahy testified that isolation in those
small, white cells leads to an increased risk of suicide. With a population of which 90% have
experienced trauma, that risk is compounded. Using it to punish FCI Dublin's{2024 U.S. Dist. LEXIS
70} incarcerated population for making false reports of misconduct poses a serious risk of also
deterring legitimate ones.

The government's arguments otherwise do not persuade. First, the government implies that, because
FCI Dublin now provides its incarcerated population more methods than ever to confidentially report
retaliation, plaintiffs cannot assert a First Amendment claim. "Speech can be chilled even when not

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

completely silenced." *Rhodes*, 408 F.3d at 568. The First Amendment does not place prisoners in a "Catch-22," where they are precluded from obtaining relief by the very act of seeking it. *Id.* at 569. The fact that incarcerated persons can now report retaliation from the SHU is cold comfort.

Second, because FCI Dublin is understaffed, the government argues, its use of the SHU to deter false reporting is reasonable. Being short-staffed is not an excuse for retaliatory conduct, especially when staffing levels are a consequence of DOJ's criminal investigation. Those incarcerated should not bear the penalty of then-warden Garcia's administration of abuse. *Cf. Jordan*, 986 F.2d at 1529 (rejecting a jail superintendent's rationale for imposing a new penological policy because "[t]he wish to avoid a lawsuit from an employees' union" could not "provide a justification for{2024 U.S. Dist. LEXIS 71} inflicting pain of a constitutional magnitude upon inmates")

Finally, and perhaps most critically, the Dublin Task Force's report suggests that the issue of staff morale fundamentally stems from a broader distrust between FCI Dublin and its incarcerated population. The Task Force warned FCI Dublin that this distrust is fueled by both a pervasive lack of communication and the derogatory manner with which some staff treat those incarcerated. It is because of this distrust, the Task Force noted, that operational changes are viewed as "retaliation," or punishment, for being sexually assaulted.118 More broadly, the Task Force noted, incarcerated persons are concerned with retaliation because they are regularly threatened with it for making any kind of request. Remarkably, FCI Dublin has not addressed the issue proactively by communicating more openly with its incarcerated population. For that reason, as the Court witnessed during the evidentiary hearing, the imposition of what FCI Dublin insists are national protocols-like visual searches after legal visits-are widely perceived as retaliation.

### C. Irreparable Harm

The parties dispute whether plaintiffs are likely to suffer irreparable harm absent{2024 U.S. Dist. LEXIS 72} a preliminary injunction. "It is well established that the deprivation of constitutional rights," including lack of adequate medical care, "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)); *Porretti*, 11 F.4th 1037 at 1050.

As stated, the Court finds that plaintiffs are likely to succeed in their Eighth Amendment claims for the risk of sexual abuse and serious medical neglect, along with their First Amendment claim that they face an ongoing risk of retaliation. Without injunctive relief, plaintiffs will face ongoing retaliation, including internal transfer to the SHU or external transfer to an outside facility, for filing allegations of sexual abuse. Due to the severe understaffing of FCI Dublin's counselors, medical staff, and psychologists, plaintiffs risk imminent and serious medical injury, including lack of treatment for serious medical ailments, psychological distress, and risk of suicide. *See Porretti*, 11 F.4th at 1050 (finding that these types of injuries constituted irreparable harm).

In so finding, the Court is informed by the fact that prison officials at FCI Dublin acknowledged its incarcerated population was suffering ongoing and untreated trauma from the sexual abuse inflicted on them by the previous administration. FCI Dublin's chief psychologist,{2024 U.S. Dist. LEXIS 73} Dr. Mulcahy, for example, testified that many of the incarcerated persons at FCI Dublin had "survived some pretty horrific and traumatic things at the hands of some former staff."119 With such a magnitude of need, Dr. Mulcahy testified that, though she was trying to regain the trust of the incarcerated population and provide programming, she did not think the mental health services available were "sufficient."120

### D. Balance of Equities/Public Interest

"The third and fourth factors of the preliminary-injunction test-balance of equities and public

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

interest-merge into one inquiry when the government oppose a preliminary injunction." *Porretti*, 11 F.4th at 1050. The Court therefore examines these two factors in tandem.

"It is always in the public interest to prevent violation of a party's constitutional rights." *Porretti*, 11 F.4th at 1050 (cleaned up). Those incarcerated at FCI Dublin and its satellite camp were subject to horrific, systemic sexual abuse that resulted in the unprecedented criminal indictment of eight prison officials, including the previous warden, chaplain, and various correctional officers. It understands that, since then, BOP has made changes to FCI Dublin's personnel and culture. Those changes have had some positive impacts:**{2024 U.S. Dist. LEXIS 74}** Of the estimated one hundred incarcerated women, transgender men, and non-binary people the Court spoke to during its nine-hour visit to FCI Dublin and its satellite camp, no one complained that the prison still had a "sexualized" culture.

The Court nonetheless remains concerned with the recent allegations of sexual assault, especially because the Court spoke to less than fifteen percent of the total population. Moreover, staff remain under investigation and plaintiffs have brought forth serious allegations of retaliation, including a few involving sexual assault.

In addition, probative evidence exists that FCI Dublin continues to deter inmates from filing administrative grievances by threatening its incarcerated population with citations on their record, the loss of good time credits and better paying jobs, and placement in the SHU for doing so. Its medical and mental health services are understaffed, leaving those incarcerated at FCI Dublin without access to urgently needed care. Without the requisite staff, the conditions of confinement, especially at the satellite camp, have progressively deteriorated. Given FCI Dublin's extraordinary recent history, which continues to shape the**{2024 U.S. Dist. LEXIS 75}** way that prison officials manage and treat the incarcerated individuals in their care, the public interest would be best served by, and the balance of equities favors, injunctive relief.

**E. Requested Relief**

Based on the foregoing, the Court will appoint a special master consistent with federal law. 18 U.S.C. § 3626(f)(1)(A). Too much remains to be done urgently and the Court cannot be physically present on the property on a daily basis to ensure compliance. The remedial actions necessary are entirely too complex without the help of a special master. *Id.* § 3626(f)(1)(B).

However, the Court finds that some of the relief sought by plaintiffs is currently not merited. As to the issue of reporting staff misconduct and access to legal counsel, the Court finds that there is an insufficient record of constitutional risk requiring the requested relief. BOP has provided numerous avenues for confidential reporting through email and the TRULINK process and direct communication to lawyers and the DOJ among others.121 The Court agrees that communication could be better but that alone does not justify monitoring. On this point, the requested relief is **Denied**.

Moreover, as to the request to fix the computer's privacy screens, the Court did not**{2024 U.S. Dist. LEXIS 76}** observe people waiting in long lines to use the computers, so any privacy risk to a person using the computer is too attenuated. Although it is obvious that the system is not perfect, perfection is not required. Further, FCI Dublin now provides more legal access than other institutions. For that reason, this request relief is **Denied**.

Further, the Court does not find any need to address the return of non-contraband items seized from individuals' cell during searches. The record does not indicate a currently existing constitutional risk requiring such relief. Accordingly, the request is **Denied**.

**CONCLUSION**

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

For the reasons set forth above, including recent events after the evidentiary hearing, the Court **Grants** the motion for class certification and **Grants in Part and Denies in Part** the motion for a preliminary injunction. The Court ordered the parties to appear before it on **Friday, March 15, 2024, at 3:00 p.m.** The Court will issue a supplemental order on the requested relief after that hearing.

This terminates Dkt. Nos. 10, 11, 45, 75, 99, 102, 111, 143, 159, 162, 168, 176, 178, 184, 191, 197, 199, 204, 206, 209.

**It Is So Ordered.**

Date: **March 15, 2024**

/s/ Yvonne Gonzalez Rogers

**Yvonne Gonzalez{2024 U.S. Dist. LEXIS 77} Rogers**

**United States District Court Judge**

### US Dist LEXIS 57206">Footnotes

1

Plaintiffs also bring suit against several FCI Dublin officers in their individual capacities. Because these claims are not relevant for either class certification or preliminary injunctive relief, the Court does not address these claims here.
2

The Court also **Grants in Part** the related sealing motions. To the extent publicly referenced in this Order, the Court finds that the information is not sufficiently sensitive to outweigh the right of the public to have access to the information. To expedite release of this Order, the Court will address plaintiffs' objections under separate cover.
3

FCI Dublin, *Federal Bureau of Prisons*, (https://www.bop.gov/locations/institutions/dub/ ).
4

Bureau of Prisons, *Inmate Security Designation and Custody Classification*, (https://www.bop.gov/policy/progstat/5100_008cn.pdf ).
5

*See, supra*, Note 3.
6

Until recently, and when the sexual abuse investigation detailed further below was ongoing, the facility was overcrowded. Ex. O, BOP, *Dublin Task Force Report*, March 2022 at 4-6.
7

Tr. 40:22.
8

On December 13, 2022, the bipartisan Permanent Subcommittee on Investigations launched an investigation into the sexual abuse of female prisoners in BOP custody. It concluded that in at least two-thirds of federal prisons there were substantiated allegations of sexual abuse over the past decade. Sexual Abuse of Female Inmates in Federal Prisons Staff Report, *Permanent Subcommittee*

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*on Investigations, United States Senate,*
(https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf ) ("PSI report").
9

*United States v. Klinger*, Case No. 4:22-cr-31-YGR (pled guilty to six counts of sexually abusing a ward).
10

*Id.*, Sentencing, January 24, 2024.
11

*United States v. Garcia*, Case No. 4:21-cr-429-YGR. After a jury trial, Garcia was found guilty of three counts of sexual abuse of a ward, four counts of abusive sexual contact, and one count of false statements to a government agency.
12

*Generally*, Dkt. No. 145, Sentencing Memorandum of United States.
13

*Id.*
14

*Id.*
15

*United States v. Bellhouse*, Case No. 4:22-cr-66-YGR (convicted of two counts of sexual abuse of a ward and three counts of abusive sexual contact); *United States v. Highhouse*, Case No. 4:22-cr-16-HSG (pled guilty to two counts sexual abuse of a ward, two counts of abusive sexual contact, and one count of making a false statement); *United States v. Chavez*, Case No. 4:22-cr-104-YGR (pled guilty to one count of sexual abuse); *United States v. Smith*, Case No. 4:23-cr-110-YGR (indicted for several counts of sexual abuse of a ward, abusive sexual contact, and one count of aggravated sexual abuse); *United States v. Nunley*, Case No. 4:23-cr-213-YGR (pending indictment for sexual abuse of a ward, abusive sexual contact, and making false statements); *United States v. Jones*, Case No. 4:23-cr-212-YGR (pled guilty to six counts of sexual abuse of a ward and one count of making a false statement).
16

*See, e.g., United States v. Bellhouse*, Case No. 4:22-cr-66-YGR, Dkt. No. 177, Sentencing Memorandum of United States (noting evidence that one woman who was sexually abused by Officer Bellhouse was placed in the SHU after reporting the abuse).
17

Dublin Task Force Report at 8.
18

*See, supra*, Note 25; some of these allegations led to the criminal indictment of Officer "Dirty Dick" Smith. *See also*, Dublin Task Force Report at 7, 10-11.
19

Dublin Task Force Report at 24.
20

Dublin Task Force Report at 24.
21

lyicases                                                  **26**

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*See also*, Dublin Task Force Report at 11-12.
22

Dublin Task Force Report at 12, 34-45 (FCI Dublin officer told inmates that if they were to file any
further grievance, "you will be got and go to SHU before you make it back.").
23

Dublin Task Force Report at 16-17.
24

Dublin Task Force Report at 31, 33.
25

Dublin Task Force Report at 33.
26

Dublin Task Force Report at 25.
27

Dublin Task Force Report at 26. Even when it did have the capacity, because of the toxic mistrust
between staff and inmates, staff refused to process inmate paperwork for medical care. Medical staff
refused to see inmates for urgent issues even when the Task Force members attempted to
intervene.
28

Dublin Task Force at Report at 20-21.
29

Dublin Task Force Report at 17-19, 31.
30

Dublin Task Force Report at 21-23.
31

Moss Group, *Assessment Report, Building a Culture of Safety{2024 U.S. Dist. LEXIS 21}* at 11, 13.
32

Moss Group Report at 11, 13, 22.
33

As the Court notes below, the New Leadership team has since been replaced.
34

Dkt. No. 206-3 ¶ 3.
35

Tr. 1044:11-13
36

Tr. 1072.
37

Tr. 992-96.
38

Tr. 992:10-11.
39

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

In addressing these arguments, the Court will at times reference evidence submitted under seal. In addition, shortly before issuance, BOP once again changed FCI Dublin's executive team. The Court still relies on the testimony given by the past warden, assistant warden, satellite camp administrator, and captain.
40

Though plaintiffs also request injunctive relief on their Fifth Amendment claim, *see* FAC ¶¶ 258-62, they did not brief this claim in their preliminary injunction briefing, so the Court does not address it here.
41

The government argues in a footnote in its post-evidentiary hearing opposition that the Court should not consider plaintiffs' First Amendment retaliation claim because it was briefed only in their post-evidentiary hearing brief. Putting aside that substantive arguments raised in footnotes are disfavored, the government had ample notice that plaintiffs sought injunctive relief on their retaliation claim from both plaintiffs' initial brief, evidence presented at the evidentiary hearing, and their post-evidentiary hearing briefs. The Court therefore considers both the Eighth and First Amendment claims here.
42

Throughout plaintiffs' FAC, in their preliminary injunction briefing, at the evidentiary hearing, and in the Court's own inspection of FCI Dublin, the claims for serious medical neglect and unconstitutional conditions of confinement were raised. The claims sound in the Eighth Amendment. *See Farmer*, 511 U.S. at 832. Because the Court gave both parties the opportunity to be heard on the medical and mental health services available at FCI Dublin and, given the urgency of need the Court itself witnessed, it considers these claims here while acknowledging that plaintiffs' papers are unhelpfully vague as to the grounds for relief.
43

*United States v. Highhouse*, Case No. 4:22-cr-16-HSG-1, Dkt. No. 23, United States' Sentencing Memorandum at 3.
44

*Id.*
45

*United States v. Jones*, Case No. 4:23-cr-212-YGR-1, Dkt. No. 20, United States' Sentencing Memorandum at 2.
46

Dkt. No. 10-3, J.L. Decl. ¶ 5.
47

Dkt. No. 10-30, C.A.H. Decl. ¶¶ 4, 7.
48

*Id.* ¶ 7.
49

*Id.* ¶ 8.
50

Dkt. No. 10-7, J.D. Decl. 6.
51

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*See, e.g., United States v. Garcia,* Case. No. 4:21-cr-429-YGR, Dkt. No. 166, Judgment.
52

Dkt. No. 10-15, S.L. Decl. 4.
53

*Id.* 5.
54

*Id.* 6.
55

Dkt. No. 10-4, Decl. J.M. 6.
56

Dkt. No. 10-14, Decl. A.H.R. 9.
57

*See, e.g.*, Dkt. No. 31, Decl. M.S. ¶ 4.
58

Dkt. No. 209-3 at 2.
59

The government argues that the Court should consider only the testimony of the incarcerated women
who testified at the evidentiary hearing and not the rest of the declarations. As stated, the Court
focuses on more recent allegations of sexual assault, whether elicited through declaration or at the
hearing. That said, the Court does not weigh heavily alleged sexual assault where the inmate did not
witness or experience the alleged sexual assault.
60

Dkt. No. 10-43, Decl. A.R. 5-8.
61

Tr. 724:12-20.
62

Tr. 740:17-20.
63

Tr. 741:5-6.
64

Tr. 927:8-14.
65

Tr. 929:7-10, 20.
66

Tr. 661:20-23.
67

*See, e.g.*, Tr. 730:6-8.
68

For instance, the prison successfully passed a PREA evaluation even though then-warden Garcia
assaulted an incarcerated woman while the auditors were at FCI Dublin. *United States v. Garcia*, Dkt.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

No. 145 at 2-3.
69

Dkt. No. 211.
70

Tr. 225:7-13.
71

Tr. 229:13-24.
72

Tr. 333:25, 334:1.
73

Tr. 1131:4-9.
74

Dkt. No. 209-3.
75

Dkt. No. 209-3. The Court has read the administrative grievance filed by this plaintiff at Dkt. No.
209-5. The government's response-that it did not have sufficient information to determine the identity
of the accused officer-is not credible. *See* Dkt. No. 206-3.
76

Dublin Task Force Report at 11.
77

Tr. 40:22. Agostini and Mulcahy concurred.
78

*See, e.g.*, Dkt. No. 10-17, Decl. J.L.H. ¶ 10.
79

*See, e.g.*, Dkt. No. 10-5, Decl. G.M. ¶ 20.
80

Tr. 774:4-21.
81

Dkt. No. 10-2, R.B. Decl. ¶¶ 9-10.
82

Dkt. No. 10-4, J.M. Decl. ¶ 17.
83

Dkt. No. 10-11, L.T. Decl. ¶ 16
84

Dkt. No. 10-20, B.S. Decl. ¶ 15.
85

Dkt. No. 10-2, R.B. Decl. ¶ 12; Dkt. No. 10-18, E.A. Decl. ¶ 15; *see also*, Dublin Task Force Report
at 26.
86

Fed. Bureau of Prisons, Care Level Classifications for Medical and Mental Health Conditions or

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

Disabilities 1 (2019), (https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf .)
87

Tr. 1155.
88

Tr. 998-99.
89

Tr. 967:1-23.
90

Tr. 967.
91

Tr. 971:1-2.
92

*Id.*
93

Tr. 971:23.
94

Tr. 973:16-25 and 974:13-16. Later, the government brought charts to the evidentiary hearing that did, in fact, seem to track some of the care provided by the health administration. The conflicting accounts, at this early juncture, are concerning enough that the Court recounts Wilson's initial testimony.
95

Tr. 1059:10 and 1060:11-12.
96

Tr. 1059:1-10.
97

Tr. 1048.
98

Tr. 1081:7.
99

Tr. 1079.
100

Tr. 1069.
101

Tr. 1072.
102

R.B. Decl. 16.
103

BOP Care Level Classifications, *supra* note 86.
104

*Id.*

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

105

Tr. 968:12-14 and 976:12-17. Later, Dr. Mulcahy testified that FCI Dublin in fact has the capacity to
house some Care Level 3 incarcerated persons. Again, at this early juncture and in the interest of
laying out its concerns, the Court recounts Wilson's testimony as presented.
106

*See* Tr. 1034.
107

As previously noted, the Court issued orders following its visit for immediate, specific issues based
on emergency health and safety concerns at the satellite camp. As relevant, it ordered the
government to schedule asbestos, mold, and infectious diseases inspections and requested the
medical histories of incarcerated women who had particularly concerning symptoms. Dkt. No. 157.
108

The government responded by sending the medical histories of those two individuals and ordering an
evaluation by an infectious disease expert. To its credit, the government had been aware of the
concerning symptoms of those incarcerated individuals which the Court raised. It is not clear to the
Court, however, that their symptoms were addressed with sufficient urgency.

With respect to the outbreak of a red rash the Court witnessed, this concern was not addressed by
medical staff because it was raised by various incarcerated women but rather because the Court
ordered it. This quick inspection turned up some serious issues, including a case of ringworm. Dkt.
No. 199-3. Without the Court's intervention, it is not clear that this highly infectious disease would
have been caught.
109

Dublin Task Force Report at 26.
110

Though it is not within the scope of plaintiffs' preliminary injunction motion, one of the issues raised
during the Court's unannounced visit was that FCI Dublin is failing to provide Jewish inmates with a
sufficiently nutritious kosher diet. *See Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) (A
"prison's refusal to provide a kosher meat diet implicates the Free Exercise Clause.") Should it
become apparent in the course of this litigation that the provision of diets to fulfill inmates' sincerely
held beliefs raises classwide constitutional questions, the Court will address them then.
111

In its post-evidentiary hearing opposition, the government suggests that plaintiffs can only succeed
on their First Amendment retaliation claim if they show that prison officials were deliberately
indifferent. This state-of-mind requirement applies only to Eighth, not First, Amendment claims, as
laid out above. For that reason, the Court declines to apply this standard in evaluating plaintiffs' First
Amendment claims.
112

Tr. 1042:18-22.
113

Tr. 677:20-25, 678:1-16.
114

Tr. 681-82.
115

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

Tr. 576.
116

Another incarcerated person who was scheduled to testify at the evidentiary hearing was also placed
in the SHU. While the Court was visiting FCI Dublin, it asked why she had been placed there and
was told for "compromising staff." No further explanation was available at the time from her SHU
documentation. The Court noted its concern with staff.
117

Dkt. No. 197. As the Court noted during one of the hearings, it generally did not find R.F. to be a
credible witness. She has filed hundreds of complaints against BOP, many of which have been
dismissed as frivolous. She has also provided other incarcerated women with help on their
compassionate release motions, for which she testified, they "blessed" her with a $1,000.
Nonetheless, on this point, the Court finds her allegation of retaliation here to be credible.
118

Dublin Task Force at 12.
119

Tr. 1042:23-24.
120

Tr. 1072:9-11
121

In fact, the direct email to DOJ was closed after a significant decrease in contemporaneous reports
suggested that the facility was operating within proper parameters.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

NAME: Mahsa Parviz
REG# 54653509
FEDERAL TRANSFER CENTER
P.O. BOX 898801
OKLAHOMA CITY, OK 73189-8801

Roybal Federal Courthouse
ATTN: CLERK (file in 2:21-cr-00293-SB)
255 East Temple St.
Los Angeles, CA 90012

NAME: Mahsa Parviz
REG# 54653509
FEDERAL TRANSFER CENTER
P.O. BOX 898801
OKLAHOMA CITY, OK 73189-8801

Roybal Federal Courthouse
ATTN: CLERK (file in 2:21-cr-00293-SB)
255 East Temple St.
Los Angeles, CA 90012







Mahsa Parviz #54652509
Federal Transfer Center
P.O. Box 898802
Oklahoma City, OK 73189

**Retail**

U.S. POSTAGE PAID
USPS Ground Advtg
OKLAHOMA CITY, OK 73159
FEB 06, 2025

90012

**$0.00**

RDC 01    0 Lb 13.70 oz    S2324M501870-04

Sealed In the
Presence of Staff

Sealed In the
Presence of Staff

Roybal Federal Courthou
ATTN: CLERK (please file in 2:21
* NOTICE Random assignmen
required prior to consideration
255 East Ten
Los Angeles, CA

Presence of Staff

USPS TRACKING® #

9500 1150 2883 5037 4623 93



Sealed In the
Presence of Staff

Sealed In the
Presence of Staff

Sealed In the
Presence of Staff

Presence of Staff